**UNITED STATES of America**

v.

**David F. SKLAR, Defendant.**

**Crim. No. 89–30008–F.**

United States District Court,
D. Massachusetts.

Sept. 21, 1989.

---

Kevin O'Regan, Asst. U.S. Atty., Springfield, Mass., for plaintiff.

Michael Ascher, Springfield, Mass., for defendant.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I.  INTRODUCTION

Before the Court is defendant David Sklar's ("Sklar") motion to suppress evidence obtained by the United States as a result of a search conducted of an Express Mail Package by Postal Inspector Willfred Moores ("Moores").  The search was conducted by Moores pursuant to a search warrant issued by United States Magistrate Michael A. Ponsor on January 24, 1989.

Sklar proffers a variety of objections to the search, which will be dealt with in detail below.  These objections run the gamut of modern criminal evidentiary disputes: there was no reasonable suspicion to justify a canine sniff of his mail, the canine Harko was unreliable, the sniff was inherently intrusive, and various administrative procedures were not adhered to by either the Postal Inspector or the Magistrate.  As will be seen, however, none of these objections is weighty enough to merit burying the seized materials.

### II.  BACKGROUND

The relevant facts, about which there is no dispute, are as follows.  On January 24, 1989, Postal Inspector Moores submitted to Magistrate Ponsor an application and affidavit for a search warrant.  *In the Matter of the Search of Express Mail Package No. B51550087*, Case No. 89–1602–MP (D.Mass. Jan. 24, 1989).  In his affidavit, Moores made the following statements:

(a) That he, Moores, has been a postal inspector for eight years, five of which have been spent investigating prohibited mail, including narcotics and controlled substances.  In May, 1988, he attended a week-long course at Postal Headquarters, focusing

solely upon the detection of controlled substances in Express Mail Packages. Moores Affidavit, ¶ 1.

(b) As a result of the Postal Service's increased awareness of the use of Express Mail to send controlled substances, Express Mail delivery receipts are now reviewed regularly. Based on his experience as a Postal Inspector, Moores has learned that southern Florida, including the area of Boca Raton, "is known to be a source for the distribution of controlled substances." *Id.*, ¶ 3.

(c) During a recent review of Express Mail receipts in the Springfield, MA post office, Moores uncovered what he considered to be eleven suspicious mailings from Boca Raton, FL. Ten were addressed to the defendant at Box 35, Montereay [*sic*], MA 01245. The eleventh was addressed to the defendant at Box 730, Stockbridge, MA 01262. The labels appeared to have been written by the same individual using the same name, but four different return addresses, three of which were subsequently found to be non-existent. *Id.*, ¶ 4.

(d) On or about January 17, 1989, Moores requested that postal officials in Stockbridge notify him if any Express Mail packages were received for delivery to the defendant. On January 23, 1989, Stockbridge postal officials notified Moores that an Express Mail package addressed to David Sklark [*sic*] had been received. The package bore an originating/return address of R.J. Textils, 1470 Southwest 5th Ave., Boca Raton, FL 33432. Moores checked with postal officials in Boca Raton, FL, and learned that there is no R.J. Textils at the address given. *Id.*, ¶¶ 6–7.

(e) Moores then requested that U.S. Postal Inspector A.R. Dockus go to Stockbridge and bring the package back to the Springfield office of the Postal Inspection Service, where a trained narcotics dog would be allowed to "sniff" the package. *Id.*, ¶¶ 8–9.

(f) At the Postal Inspection Service Office, Moores met with Massachusetts State Trooper John Giammarco and his trained narcotics dog "Harko." Moores was told by Trooper Giammarco that both Giammarco and Harko had graduated ten days earlier from "a 17 week school in canine detection sponsored by the Massachusetts Department of Public Safety." Giammarco further stated that Harko was trained to detect the controlled substances cocaine, heroin, marijuana, and hashish. *Id.*, ¶ 10.

(g) When Inspector Dockus returned with the package from Stockbridge, Moores laid out five other Express Mail packages of similar shape and size to the one addressed to the defendant. However, none of the five dummy packages contained any controlled substances. The six packages were placed in a row on the floor of a vacant office. Trooper Giammarco allowed Harko to search the area. Harko "bit, scratched and clawed" at the Express Mail package addressed to the defendant, but did not respond to the five dummy packages. Moores was advised by Trooper Giammarco that Harko's reaction was his indication that a package contained some kind of controlled substance. *Id.*, ¶ 11.

(h) Following Harko's reaction of the package, Moores took possession of the Express Mail package at approximately 1:30 p.m. on January 23, 1989. *Id.*, ¶ 12.

Based on Moore's affidavit, Magistrate Ponsor issued a search warrant allowing Moores to examine the contents of Express Mail Package No. B51550087. Upon doing so, Moores discovered approximately three ounces of a substance which field tested positive for cocaine. Moores replaced the substance in the package, drove to Stockbridge, and left a notice in the defendant's P.O. Box indicating that an Express Mail package had been received.

At approximately 4:40 p.m. on January 24, 1989, the defendant's brother, Neal Sklar, picked up the notice from the P.O. Box. About ten minutes later, the defendant picked up the package itself from the Stockbridge post office. Once Sklar left the post office with the package, he was apprehended and arrested by Moores. Upon being advised of his *Miranda* rights, Sklar admitted that he knew what was inside the package.

The question before the Court now is whether any of the defendant's objections highlight legitimate flaws in Moores' handling of the sniff of this particular Express Mail package. For various reasons, the Court concludes that no errors were made.

## III. DISCUSSION

### A. There Was Reasonable Evidence Upon Which to Base Scrutiny of the Package

█ The affidavit of Postal Inspector Moores reveals him to be a well-trained investigator, with particular expertise in the use by criminals of Express Mail packages for the distribution of controlled substances.

In his affidavit in support of a search warrant, Moores listed several indicia which made him suspicious of the package in question. The Court has reviewed the evidence, and concludes that Moores was amply justified in his skepticism regarding the legality of the package's contents. Specifically, the Court finds it significant, as did Moores, that: the defendant received several packages within a short time from a known drug source area; that while the packages apparently originated from the same person, they also originated from several different addresses; and finally, that a cursory check revealed that all but one of the return addresses was fraudulent.

Under the circumstances, Moores' suspicion as to the contents of Express Mail Package No. B51550087 was reasonable.

### B. Alleged Violations of 39 C.F.R. § 233.3 Do Not Justify Exclusion

█ As one of its investigative tools, the Postal Service has devised the process of "mail cover," by which "a record is made of data appearing on the outside of mail to obtain information pertaining to the commission or attempted commission of a crime." 39 C.F.R. § 233.3(c)(1). The defendant argues that Postal Inspector Moores failed to obtain authorization for the "mail cover" employed in the investigation of this case. In light of Moores' failure to abide by the approval procedures set out in 39 C.F.R. § 233.3, the defendant argues that the evidence obtained as a result of the investigation should be suppressed. Defendant's Memorandum of Law in Support of Defendant's Motion to Suppress Evidence at 22–23.

The government responds that with respect to the Express Mail package at issue, Moores *did* obtain authority for a mail cover on or about January 17, 1989. The Court has searched for clear evidence in the record before to support that statement, and has been unable to find it. However, even assuming for the moment that the government's claim is false and that Moores did not obtain authority for any "mail cover," the Court agrees that a failure to do so would not be fatal in this case, since a failure to obtain authority for mail cover does not raise issues of constitutional import.

█ The Supreme Court has held that "a court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law." *United States v. Caceres,* 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979). In this particular case, it is clear that the regulation embodied in 39 C.F.R. § 233.3 is not required by either the Constitution or federal law. While the Supreme Court has emphatically stated that first-class mail "is free from inspection by postal authorities, except in the manner provided by the Fourth Amendment," *United States v. Van Leeuwen,* 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed.2d 282 (1970), it has also clearly found that the protections of the Fourth Amendment are not triggered by mere inspection by postal authorities of

information contained on the outside of a piece of first-class mail. *Van Leeuwen*, 397 U.S. at 252, 90 S.Ct. at 1032; *see generally United States v. Clark*, 695 F.Supp. 1257, 1261–1263 (D.Me.1988) (collecting cases).

The law is clear, then, that even if the factual dispute as to whether or not Moores obtained authorization for the use of "mail cover" is resolved in the defendant's favor, the breach of postal regulations was not so severe as to merit suppressing the evidence obtained.

### C. Moores' Reliance on a "Drug Profile" Was Not Erroneous

Sklar argues that Moores based his entire suspicion of Express Mail Package No. B51550087 on a post office "profile." Such an approach is flawed, Sklar contends, because there was a total lack of evidence suggesting criminal activity. In the defendant's view, the profile allegedly relied upon by Moores is too broad, and runs afoul of the standards set forth by the Supreme Court in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

The defendant is correct that the sheer breadth of an agency profile may be so great as to subject innocent travelers (or mail) to "virtually random seizures," a result forbidden by the Fourth Amendment. *Reid*, 448 U.S. at 440, 441, 100 S.Ct. at 2753, 2754. However, the profile criticized in *Reid* is demonstrably different from the profile relied on by Moores. The Supreme Court ruled that a Drug Enforcement Agency ("DEA") agent lacked reasonable suspicion to justify a stop of a passenger, despite the fact that he fit the DEA drug courier profile, when the sole facts relied upon by the agent were that:

(1) the [passenger] had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling

together, and (4) they apparently had no luggage other than their shoulder bags. *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. Of the elements of the profile, the Supreme Court found only one, the attempted concealment of the travel relationship, which pertained to the actual conduct of the passengers at the time the agent observed them. *Id.* By itself, the Court concluded that a mere attempt at such concealment was "simply too slender a reed to support seizure in [that] case." *Id.*

The Supreme Court's most recent discussion in this area helps clarify the analysis to which this Court should subject Moores' use of the postal profile. Specifically, the Supreme Court wrote that "[a] court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to [his] conclusion...." *United States v. Sokolow*, — U.S. —, —, 109 S.Ct. 1581, 1584, 104 L.Ed.2d 1 (1989). The fact that the factors relied upon by the agent are also compiled in an agency profile "does not detract from their evidentiary significance as seen by a trained agent." *Id.*

In this case, the Court is comfortable in concluding that the indicia relied upon by Postal Inspector Moores "taken together ... amount to reasonable suspicion." *Id., citing Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). Specifically, the Court repeats the evidence cited in subsection A of this opinion: the number of packages received by the defendant within a short time from a known drug source area; the use of several return addresses by the single sender; and the fact that most of the return addresses were found to be fraudulent. These items, when considered in light of Postal Inspector Moores' training and experience, amply provide a foundation of reasonable suspicion for further investigation. The facts as stated do not illustrate any unjustified reliance on an overly broad "profile."

### D. The Search Warrant in Question Was Not Improperly Issued

■ The primary evidence upon which Magistrate Ponsor based his issuance of

the search warrant was the reaction of the canine "Harko" to Express Mail Package No. B51550087. For a variety of reasons, none of them persuasive, the defendant argues that there was no probable cause to support the issuance of a search warrant.

> Sklar's main challenge is that
>
> the canine "Harko" used to conduct the sniff search was wholly unreliable as he had no proven track record to substantiate the accuracy of his observations, nor was his handler, John Giammarco's expertise established, nor was the sufficiency of the canine training established....

Defendant's Motion to Suppress Evidence Pursuant to Federal Rules of Criminal Procedure Rule 41(f), at 4.

Specifically, Sklar states that the Moores affidavit failed to set forth any evidence showing that the dog had been trained by the Drug Enforcement Agency, that the handler was a DEA agent, or that the dog had ever participated in a prior drug investigation. Citing to a 1973 article on drug detecting dogs, the defendant implies that only dogs with DEA training may be considered reliable for the purposes of supporting the issuance of a search warrant.

Such a hide-bound approach has been clearly rejected by the First Circuit in authority which Sklar himself cites. A magistrate, in determining the reliability of a canine for the purposes of issuing a search warrant, is not required to apply a "drug sniffer" profile to the canine and his handler. Instead, "[a] magistrate's determination of probable cause is based upon a common sense and realistic reading of the entire affidavit." *United States v. Meyer,* 536 F.2d 963, 966 (1st Cir.1976).

A common sense reading of the affidavit in this case provides ample indication of the team's reliability. Only ten days before the "sniff" of the defendant's package, both dog and handler had successfully completed a seventeen-week training course in narcotics detection with the Massachusetts Department of Public Safety. Sklar points to no evidence which would lead this Court to believe that the state program is any less rigorous or thorough than its federal counterpart. Also, as the government points out, the proof of the pudding was in the tasting; when faced with six packages, five known not to contain cocaine, Harko unerringly and emphatically reacted to the one package subsequently shown to hold narcotics. As "a qualified official possessing ordinary and reasonable intelligence," *Meyer,* 536 F.2d at 966, it does not strain this Court's credulity that Magistrate Ponsor concluded that Harko was a qualified informant.

The reliability of the informant having been shown, it was permissible for Magistrate Ponsor to rely on that informant's hearsay testimony in issuing a search warrant. *See* Fed.R.Crim.P. 41(c)(1) ("The finding of probable cause may be based upon hearsay evidence in whole or in part."). In language similar to that used by the First Circuit in *Meyer,* the Supreme Court has held that a magistrate's responsibility in determining the existence of probable cause

> is simply to make a practical, common-sense decision, whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons [or dogs] supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).[1]

---

1. The defendant argues that this Court should not apply the "totality of the circumstances" test laid out in *Gates,* but instead should apply the two-pronged reliability test as set forth in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). As Sklar correctly states, the Massachusetts Supreme Judicial Court did rule in 1985 that Article 14 of the Massachusetts Declaration of Rights provides greater protection than the

Fourth Amendment to the United States Constitution. *Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548, 556 (1985). Accordingly, the SJC concluded that the *Aguilar–Spinelli* test more accurately represented the level of probable cause needed in Massachusetts than did *Gates. Upton,* 476 N.E.2d at 556–557. However, it is not true, as the defendant implies, that the mere fact that a search took place in Massachusetts thereby requires application of the state

The duty of this Court in reviewing the Magistrate's issuance of the search warrant "is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* at 238–39, 103 S.Ct. at 2332–34, *citing Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960). As has been thoroughly demonstrated in the above discussion, this Court believes that the Magistrate did have substantial cause to believe that probable cause existed.

### E. A Warrantless Canine "Sniff" of an Express Mail Package Does Not Violate the Defendant's Fourth Amendment Right to Privacy

■ Sklar's last major argument is that the use of a canine sniff test prior to the obtaining of a warrant is an unreasonable intrusion of his Fourth Amendment right to privacy. Specifically, he urges this Court to adopt the reasoning of the Second Circuit in *United States v. Thomas*, 757 F.2d 1359 (2d Cir.1985), in which the Court of Appeals ruled that the warrantless use of a canine sniff to detect the presence of narcotics in the defendant's apartment was an impermissible intrusion on the defendant's legitimate privacy interest. For a variety of reasons, this Court declines to extend the principles of *Thomas* to the instant case.

It is beyond peradventure, of course, that the Fourth Amendment does protect people from unreasonable government intrusion into areas where people have a legitimate expectation of privacy. *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). The problem for Sklar is that not all intrusions are unreasonable, and not all expectations of privacy are legitimate.

In particular, courts at all levels have recognized that canine sniffs are among the least intrusive means of government investigation. As Justice O'Connor wrote about a canine sniff used at an airport,

[a] "canine sniff" by a well-trained narcotics detection dog ... does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, a sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative technique that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.

*United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). *See also Thomas*, 757 F.2d at 1366 (collecting cases).

The *Thomas* court suggested, however, and the defendant agrees, that there are instances in which a person's legitimate expectation of privacy is so great that even the relative minor intrusion of a canine sniff will run afoul of the Fourth Amendment. In *Thomas*, DEA agents operating without a warrant walked a trained canine past the apartment door of co-defendant James Wheelings ("Wheelings"). The dog indicated that narcotics were inside. Based on that information, the DEA agents ob-

standard for probable cause. In fact, the *Upton* court itself explicitly recognized the possibility that evidence seized in violation of Massachusetts but not federal law could still be used in a federal prosecution such as the one before this Court. *See Upton*, 476 N.E.2d at 558 n. 11. Since this is a federal prosecution of a federal

crime, it is logical that the federal standard should obtain.

While obviously not called upon to address the issue, the Court is confident that even under the stricter Massachusetts standard, the Magistrate's finding of probable cause would be justified.

tained a search warrant to search the apartment. Wheelings sought to have the evidence seized (which, incidentally, did not include narcotics) suppressed as resulting from an illegal search.

In the Second Circuit's view, Wheelings did have a heightened expectation of privacy with respect to his apartment, and the use of the trained dog "impermissibly intruded upon that legitimate expectation." *Thomas*, 757 F.2d at 1367. Sklar emphatically argues that his expectation of privacy with respect to his Express Mail package is similar to that of Wheelings' expectation of privacy in his apartment. However, having reviewed the relevant case law, including two quite recent cases, the Court is convinced that the privacy interest asserted by Sklar is more akin to that discussed by the Supreme Court in *Place* (luggage) than that discussed by the Second Circuit in *Thomas* (apartment).

In *United States v. Colyer*, 878 F.2d 469 (D.C.Cir.1989), the Court of Appeals for the District of Columbia was asked to rule on whether or not the use of a canine sniff outside of the defendant's Amtrak roomette constituted an illegal search under the Fourth Amendment. For a number of reasons, the D.C. Circuit concluded that it did not.

First, the Court of Appeals stressed that because the government conduct could only reveal information with respect to contraband items, the sniff interfered with no legitimate privacy interest. *Colyer*, 878 F.2d at 472–74 (discussing implications of Supreme Court decisions in *Place, supra,* and *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). Second, the D.C. Circuit stressed that while "[a] sleeper car does indeed possess several indicia of a dwelling ...," it does not enjoy equal status in the law. Hence, the protection afforded apartments by *Thomas, supra,* does not extend to railroad sleeper cars. *Colyer*, 878 F.2d at 475, 476.[2] Finally, the Court of Appeals cited the unintru-

sive and non-confrontational manner in which the search was conducted. *Id.* at 476–77.

Applying the D.C. Circuit's analysis to the present case, it is clear that the use of the canine sniff was not objectionable. Even if the Court were to agree (which it does not) that Sklar has a heightened, "dwelling-like" expectation of privacy with respect to his Express Mail packages, that expectation of privacy is not justified when it is asserted with respect to contraband. Even if it were, this Court would still uphold the legitimacy of the search in light of the unintrusive and non-confrontational manner in which it was conducted.

Although less squarely on point than the government would have this Court believe, the recent First Circuit decision in *United States v. LaFrance*, 879 F.2d 1 (1st Cir. 1989), does reflect the general approval with which canine sniff tests are regarded. Faced with a challenge of the government's seizure and search of the defendant's Federal Express package, the First Circuit cited the use of the sniff test as evidence of the government's attempt to minimize the intrusion into the defendant's privacy interest. *LaFrance*, 879 F.2d at 8 (*citing Place*, 462 U.S. at 707, 103 S.Ct. at 2644).

In this Court's view, the use of the canine Harko to determine whether or not probable cause existed to search Express Mail Package No. B51550087 was not an unreasonable intrusion on a legitimate expectation of privacy of the defendant.

## IV. CONCLUSION

For the reasons set forth above, defendant Sklar's motion to suppress evidence is DENIED.

It is So Ordered.

2. In light of its conclusion that the Supreme Court finds no legitimate privacy interest in the continued secrecy of contraband items, the D.C. Circuit questioned the Second Circuit's conclu-

sion in *Thomas* that contraband in an apartment is shielded from "sniffs" by trained canines. *Colyer*, 878 F.2d at 475.