**UNITED STATES of America,**
**Appellant,**

v.

**David SKLAR, Defendant, Appellee.**

**UNITED STATES of America, Appellee,**

v.

**David SKLAR, Defendant, Appellant.**

**Nos. 90–1450, 90–1451.**

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1990.

Decided Dec. 3, 1990.

Kevin O'Regan, Asst. U.S. Atty., Ware, Mass., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for the U.S.

Michael P. Ascher, Springfield, Mass., for David Sklar.

Before SELYA, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

SELYA, Circuit Judge.

In computing the guideline sentencing range (GSR) applicable to this case, the district court followed the government's urgings. The court then departed downward in imposing sentence. This Solomonic solution, *cf.* 2 Kings 3:16–28, apparently left both sides yearning for a whole baby. Cross-appeals ensued.

## I. HOW THE SENTENCE EVENTUATED

On January 24, 1989, defendant David Sklar was arrested near the Stockbridge, Massachusetts post office in possession of an Express Mail package containing approximately 75 grams of cocaine. A federal grand jury subsequently returned an indictment charging Sklar with conspiracy to traffick in drugs and possession of cocaine with intent to distribute it. *See* 21 U.S.C. §§ 846, 841(a)(1). There was considerable pretrial skirmishing, occupying many months. Eventually, however, defendant pled guilty to both counts of the indictment.

On March 9, 1990, a sentencing hearing was held and evidence taken. The district court resolved defendant's objections, made a series of findings, and proceeded to calculate the GSR. *See generally United States v. Diaz–Villafane,* 874 F.2d 43, 47–48 (1st Cir.) (explaining method of computation under federal sentencing guidelines), *cert. denied,* —— U.S. ——, 110 S.Ct. 177,

107 L.Ed.2d 133 (1989); *United States v. Wright*, 873 F.2d 437, 440 (1st Cir.1989) (similar). No useful purpose would be served by retracing the details of that computation. For introductory purposes, we need observe only that the court determined the GSR to be 37–46 months. *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table) (adjusted offense level of 20; criminal history category II). The court then departed downward, citing defendant's posture of rehabilitation during the interval between indictment and sentencing, as well as defendant's cooperation with the government. The defendant was sentenced to serve 30 months in prison, plus a term of supervised release.

On appeal, Sklar challenges the "relevant conduct" component of the GSR calculation while the prosecution challenges the downward departure. We address these points *seriatim*, memorializing particular facts to the extent required in connection with each segment of our discussion.

## II.   RELEVANT CONDUCT

Sklar notes that the district court's computation of the GSR rested upon its finding that his relevant criminal conduct involved at least 300 grams of cocaine. *See* U.S. S.G. § 2D1.1(c)(11) (rev. ed. 1989) (Drug Quantity Table) (establishing base offense level of 22 where conduct implicates "300 G but less than 400 G of cocaine").[1] The arrest netted only 75 grams and Sklar claims that the government never proved that he handled, or should be held to account for, any more copious quantities.

### A.   *The Facts.*

The pertinent facts are these. The envelope accepted on January 24, 1989 was the twelfth similar Express Mail package Sklar had received since June 1, 1988. The first 11 packages were delivered without incident. They were never produced in court, inspected by government agents, or chemically tested. The known data concerning them derived mostly from postal records. The following pattern emerged:

| Package No. | Receipt No. | Date Sent | Gross Weight |
| --- | --- | --- | --- |
| 12 | B51550087 | 1/20/89 | 11.3 oz. |
| 11 | B51538727 | 11/3/88 | 5 oz. |
| 10 | B70439299 | 10/26/88 | 5.8 oz. |
| 9 | B51539015 | 10/12/88 | 8 oz. |
| 8 | B06948768Y | 9/26/88 | 9 oz. |
| 7 | B06948776Y | 8/10/88 | 7 oz. |
| 6 | B74509091 | 8/1/88 | 8.3 oz. |
| 5 | B74509084 | 7/20/88 | 7 oz. |
| 4 | B74509090 | 6/30/88 | 1.9 oz. |
| 3 | 74509093 | 6/15/88 | 5 oz. |
| 2 | 74509094 | 6/9/88 | 10 oz. |
| 1 | 74563671 | 6/1/88 | 3 oz. |

The sender's receipts on file were all inscribed in what appeared to be the same handwriting and bore a series of apparently fictitious trade names signifying the originator(s). At various times, the receipts reflected four return addresses in the Boca Raton area (three of which were nonexistent). Without exception, the mailings originated from southern Florida and were addressed to defendant.

The first 10 packages were sent to a postal box in Monterey, Massachusetts which Sklar and his brother, Neal, controlled. The defendant gave up that box and, on November 1, 1988, rented a new one in Stockbridge. The eleventh package was sent there. Unbeknownst to Sklar, however, the repeated mailings from Florida had triggered a Postal Inspection Ser-

---

**1.** Sklar received a two level credit for acceptance of responsibility, U.S.S.G. § 3E1.1, bringing his adjusted offense level from 22 to 20.

The prosecution does not contest this adjustment.

vice Drug Distribution Profile, *see United States v. Sklar*, 721 F.Supp. 7, 11 (D.Mass. 1989), and the newly hired box was placed under surveillance. On January 23, 1989, the surveillance yielded fruit; an Express Mail package addressed to Sklar arrived in Stockbridge. The package weighed 11.3 ounces and carried a return address of R.J. Textils [sic], 1470 Southwest 5th Ave., Boca Raton, Florida. A check revealed that there was no "R.J. Textils" or similarly named entity at the stipulated return address. The next day, postal inspector Moores obtained a search warrant, opened the package, and determined that it contained approximately three ounces of cocaine.

Warming to the chase, the postal authorities immediately placed a notice in defendant's box to the effect that an Express Mail package had arrived. Neal Sklar retrieved the notice. Later that day, defendant picked up the package. When arrested, he admitted knowing the contents and said that he had recently sent money to his source in payment for the twelfth package and for an antecedent debt. The interested reader is referred to the district court's opinion refusing suppression for further facts concerning the circumstances of the defendant's apprehension. *See id.*

In determining the quantity of drugs attributable to the counts of conviction, the district court inferred that the periodic mailings to Sklar from a fictitious entity at a series of fictitious addresses were of the same ilk as the package actually intercepted. Concluding that all the mailings were part of a common scheme and estimating the quantity of contraband involved, the court found that defendant had handled upward of 300 grams of cocaine in an uninterrupted course of criminal conduct.

### B. What Is Relevant Conduct?

Under the sentencing guidelines as they relate to most narcotics cases, the base offense level—a critical datum in arriving at the GSR—is predicated in large part on the amount of drugs involved. The drug quantity is derived from all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction," whether or not charged in the indictment. U.S.S.G. § 1B1.3(a)(2). This means that "in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or . . . common scheme or plan as the count of conviction." *Id.*, commentary (backg'd); *accord United States v. Restrepo*, 903 F.2d 648, 653 (9th Cir.1990); *United States v. Blanco*, 888 F.2d 907, 910 (1st Cir.1989); *United States v. White*, 888 F.2d 490, 498 (7th Cir.1989); *United States v. Taplette*, 872 F.2d 101, 105 (5th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 128, 107 L.Ed.2d 88 (1989). We painstakingly explained the mechanical operation of this model in *Blanco*, 888 F.2d at 909–11, and therefore refrain from repastinating ground already well ploughed.

■ To bring uncharged conduct into play, the government must establish a sufficient nexus between the conduct and the offense of conviction. *See United States v. Mocciola*, 891 F.2d 13, 15 (1st Cir.1989); *United States v. Fox*, 889 F.2d 357, 360–61 (1st Cir.1989). The government's burden is to prove the nexus by a preponderance of the evidence. *See Mocciola*, 891 F.2d at 15; *Blanco*, 888 F.2d at 909. The rules of trial evidence do not apply; in weighing the facts the sentencing court may evaluate virtually any dependable information. *See* U.S.S.G. § 6A1.3 (sentencing court may consider all pertinent information which has "sufficient indicia of reliability to support its probable accuracy"); *see also United States v. Bradley*, 917 F.2d 601, 605 (1st Cir.1990); *Blanco*, 808 F.2d at 908–09; *Wright*, 873 F.2d at 441.

■ On appeal, the sentencing court's finding that drugs other than those specified in the indictment were part of the same conduct/scheme/plan is entitled to considerable deference. *See Diaz–Villafane*, 874 F.2d at 48; *Wright*, 873 F.2d at 443–44; *see also* 18 U.S.C. § 3742(d). Absent mistake of law, we review such conclusions only for clear error and will not disturb supported findings unless our scrutiny

of the record convinces us that a serious mistake was made. *See United States v. Gooden,* 892 F.2d 725, 729 (8th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 2594, 110 L.Ed.2d 274 (1990); *Mocciola,* 891 F.2d at 16.

In terms of a drug case, relevance depends upon the existence and scope of a single course of conduct, scheme, or plan. There is no available compass by which a judge can chart such boundaries with scientific precision. Judges can, however, plot some landmarks. We start from the perspective that courts must be careful to hold the adjudicative balance steady and true, giving U.S.S.G. § 1B1.3(a)(2) the scope which its letter commands while at the same time resisting prosecutorial efforts aimed at enlarging it. Not every drug transaction undertaken by every drug trafficker is necessarily linked in a meaningful sense. *See White,* 888 F.2d at 500 ("Offenses of the same kind, but *not* encompassed in the same course of conduct or plan, are excluded."). Isolated acts cannot be conjoined and drug quantities aggregated for sentencing purposes without a rational basis.

By the same token, we do not think that the Sentencing Commission intended to give section 1B1.3(a)(2) less than the due which its language portends or to create artificial barriers to its application. Direct evidence tying one act to another is not indispensable; if persuasive, circumstantial evidence will suffice to demonstrate the linkage between charged and uncharged acts. *See, e.g., Gooden,* 892 F.2d at 729. Criminal enterprises, by their very nature, tend to be conducted furtively and in the shadows. It is the rare narcotics trafficker who authors a formal business plan or keeps meticulously detailed inventory records. *Cf., e.g., Diaz–Villafane,* 874 F.2d at 48 ("Drug dealers are unlikely to make much use of position descriptions or organizational charts."). Thus, while the sentencing court's determination of the existence and scope of a particular course of conduct must be gleaned from the facts, it

will often represent a practical, real-world assessment of probabilities, based on the totality of proven circumstances. That is as it should be; in determining whether the necessary nexus exists, courts are not required to throw good judgment, human experience, and common sense to the winds.

■ Here, the facts, viewed in context, make clear that if the 12 packages sent to Sklar all contained cocaine—a question which we address below—then the district judge's finding that Sklar's receipt of the drugs comprised a single course of conduct was sustainable. The repetitive nature of the mailings, their common origin and destination, their frequency over a relatively brief time span, the unvarying use of a particular mode of shipment, Sklar's admission that he supported himself, in part, by selling drugs from September 1988 through January 1989, his lack of any known employment during that interval, and his acknowledgement when arrested that he owed the sender money for an earlier debt, were more than enough to forge the requisite linkage. *See, e.g., United States v. Woolford,* 896 F.2d 99, 104 (5th Cir.1990); *Mocciola,* 891 F.2d at 16; *United States v. Allen,* 886 F.2d 143, 145–46 (8th Cir.1989). The court could rationally have concluded that these were "drug transactions of a similar character" which, in sum, represented a single "pattern of continuous drug activity." *Gooden,* 892 F.2d at 729.

### C. *Contents of Earlier Mailings.*

■ This brings us to the heart of defendant's appeal: whether the district court's finding that the first 11 mailers contained cocaine was clearly erroneous. Essentially, the evidence as to the packages' contents boils down to (1) the sender's receipts referable to those packages, (2) the seizure of the twelfth package, (3) Sklar's post-arrest statements, and (4) the inferences logically to be drawn from this evidence under the aggregate of the attendant circumstances.[2] Although the question is close,

---

**2.** The government argues that we should accord weight to the fact that this series of mailings fit

the Postal Inspection Service Drug Distribution Profile (described in *Sklar,* 721 F.Supp. at 11).

this evidence, viewed in a light favorable to the government, was adequate to bottom the challenged finding. We explain briefly.

The receipts, the handwriting, the sender's consistent use of fictitious names, and the packages' common points of origin (south Florida) and destination (all were mailed to Sklar at remote post office boxes), were more than enough to allow a finding that all 12 envelopes had been sent by the same person. The evidence of stealth was apparent; the sender, after all, not only employed aliases, but gave four different addresses (three of which were nonexistent). In the same vein, reasonable suspicion could attend Sklar's serial rental of successive post office boxes in towns where he neither lived nor worked. The court could certainly have inferred that the mailings were illicit.

Sklar's acceptance of the twelfth package and his self-confessed knowledge of its contents also had evidentiary significance with respect to the earlier mailings. When several acts closely resembling each other occur in a series, and the known characteristics of each are on the same order, there is room to infer that characteristics not fully known will bear the same degree of resemblance. To cap the presentation, Sklar's postarrest admissions—that he knew what Package No. 12 contained, that he had survived from September 1988 to January 1989 by selling cocaine, and that the money orders found in his car were to be sent to his source to pay for the shipment in question *and* for antecedent debts—were adequate to convince a rational factfinder, on a preponderance standard, of the probable existence of cocaine in the original 11 packages. *See, e.g., Restrepo,* 903 F.2d at 654–55 (discussing quantum of proof necessary ·to meet preponderance standard in sentencing guideline context).

■ The defendant argues that because the 11 earlier packages were not produced and there was no direct evidence of their contents the district court's finding that

they contained cocaine was too speculative to stand. We do not agree. It is settled that the existence of narcotics can be satisfactorily established for sentencing purposes by circumstantial as well as direct evidence, so long as the standard of reliability is met. *See, e.g., Bradley,* 917 F.2d at 605; *United States v. Hilton,* 894 F.2d 485, 488 (1st Cir.1990); *United States v. Gerante,* 891 F.2d 364, 368–69 (1st Cir. 1989); *United States v. McMahon,* 861 F.2d 8, 11 (1st Cir.1988). The law is not so struthious as to compel a judge, in making factbound determinations under the sentencing guidelines, to divorce himself or herself from common sense or to ignore what is perfectly obvious.

### D. *Drug Quantities.*

■ Once nisi prius found, supportably, that the 11 prior packages more likely than not contained cocaine, the question remained whether the government proved that defendant's relevant conduct involved at least 300 grams of cocaine. The court decided to use the bundle actually seized as a guide. That package, which weighed 11.3 ounces, was found upon actual examination to contain just under three ounces of cocaine.[3] The 11 earlier missives weighed less—about 40 percent less, on average. *See supra* p. 109 (listing gross weights). The court estimated that each of them contained at least one-third as much cocaine (25 grams) as Package No. 12. This estimate led to the district court's finding that the first 11 envelopes held no less than 275 grams of cocaine which, when added to the 75 grams actually seized, brought the case within section 2D1.1(c)(11).

We approach this phase of our inquiry mindful that the government must prove facts central to increasing a defendant's offense level by a preponderance of the evidence. *See, e.g., Bradley,* 917 F.2d at 605; *Gerante,* 891 F.2d at 368; *Wright,* 873 F.2d at 443; *see generally McMillan v. Pennsylvania,* 477 U.S. 79, 84–91, 106

---

We need not go so far. The proven facts, and the inferences fairly drawn therefrom, exclusive of the profile itself, are sufficient to sustain the lower court's findings.

**3.** To be exact, Package No. 12 contained 75 grams of cocaine. One ounce equals 28.35 grams. *See* U.S.S.G. § 2D1.1 (Measurement Conversion Table).

S.Ct. 2411, 2415–19, 91 L.Ed.2d 67 (1986); *cf. United States v. Ocasio*, 914 F.2d 330, 332 (1st Cir.1990) (defendant has burden of proving his entitlement to downward adjustment in offense level). In cases involving disputed amounts of drugs, we believe that this standard requires the production of reliable information from which the court can reasonably conclude that the defendant, more likely than not, was actually responsible for a quantity of drugs at least equal to the threshold necessitated by the targeted offense level. We agree completely with Judge Kennedy that:

> If the exact amount [of drugs] cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate. Thus when choosing between a number of plausible estimates of drug quantity ... a court must err on the side of caution.

*United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

Two of our recent drug cases illustrate the operation of these tenets. In both cases, we approved the trial court's quantitative estimates for sentencing purposes where chemical analyses and actual weights were unobtainable. Thus, in *United States v. Gerante*, a large sum of cash was seized. The district court found as a fact that the cash represented booty realized from previous sales of cocaine. 891 F.2d at 367. We upheld this finding. *Id.* at 368. We went on to rule that the sentencing court also "had authority to (1) estimate the quantity of cocaine that [the defendant] had exchanged for the money; and (2) hold [defendant] accountable for possessing this quantity of cocaine," so long as the earlier sales were part of the same course of conduct as the offense of conviction. *Id.* at 369.

In *United States v. Hilton*, a sailboat caught fire while a mid-ocean interception was in progress. 894 F.2d at 486. A member of the boarding party saw 10 plastic-wrapped packages floating in the bilge and retrieved one of them. *Id.* He thereafter spied 12 more packages "of similar size and appearance" while peering through the bow hatch, but did not physically take possession of them. *Id.* The laboratory report on the retrieved bundle indicated that it contained marijuana and had a gross weight of 14 pounds. *Id.* For sentencing purposes, the district court concluded that it was reasonable to believe that the remaining 21 packages each contained at least 10 pounds of marijuana, notwithstanding that they were never seized or their contents analyzed. *Id.* We affirmed, holding that the court's determination of the missing packages' contents, and its estimation of the quantity of marijuana contained therein, was sufficiently reliable to stand. *Id.* at 488.

We believe that the same principles govern here. The Sentencing Commission has advised that, "[w]here ... the amount [of contraband] seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.4, commentary (n. 2).[4] In so doing, "the judge may consider, for example, ... similar transactions in controlled substances by the defendant...." *Id.*

In extrapolating from Package No. 12 to the original 11 packages, the court below followed this advice carefully and conservatively, with due regard for the defendant's rights. Over 25 percent of the weight of the seized package was cocaine. In estimating the contraband contained in the missing packages, however, the judge found that, on average, somewhat less than 20 percent of the weight was probably cocaine. We think that this conservative approach, coupled with the fact that only 300 grams (rather than the full 350) were needed to reach the applicable offense level,[5]

---

**4.** The Sentencing Commission contemplated that, where drug quantities "not specified in the count of conviction [are to] be considered in determining the offense level" and "the amount physically seized does not reflect the scale of the offense," the district court should look to this application note for guidance. *See* U.S.S.G. § 2D1.1, commentary (n. 12).

**5.** Sklar's base offense level was set at 22, predicated upon "300 G but less than 400 G of cocaine." U.S.S.G. § 2D1.1(c)(11) (Drug Quantity

safely insulates the challenged finding from clear-error attack. And we feel especially confident in this conclusion because the defendant has neither suggested any serious methodologic flaw in the district court's calculation nor advanced a better basis for ascertaining the quantity of drugs likely contained in the serial mailings.

## III. THE DOWNWARD DEPARTURE

We turn now to the government's claim that the district court erred in departing below the GSR. We review this assigned error in accordance with the three-part methodology originally limned in *Diaz–Villafane:*

> First, we assay the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. If the stated circumstances pass muster, we proceed to the next rung and determine whether those circumstances were adequately documented. After the first two levels are climbed, the departure must be measured by a standard of reasonableness.

*United States v. Aguilar–Pena,* 887 F.2d 347, 350 (1st Cir.1989) (citation omitted). *Accord Diaz–Villafane,* 874 F.2d at 49.

### A. *The Court's Reasons.*

Inasmuch as a departure necessitates "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described," 18 U.S.C. § 3553(b), we start with the question of whether the instant case presented "unusual circumstances" sufficient to remove Sklar's case from the heartland demarcated by the Sentencing Commission for the offense of conviction. *See Aguilar–Pena,* 887 F.2d at 350; *Diaz–Villafane,* 874 F.2d at 49.

The court's stated reasons for downward departure were twofold. In its written findings, the court said that it was departing because:

the following ... mitigating circumstance [sic] exist ...:

> Defendant's rehabilitation since arrest and indictment.
> Defendant's good faith efforts to offer cooperation.

These points were amplified slightly at the sentencing hearing. As to cooperation, the judge said:

> [Defendant] had enough good faith in attempting to cooperate with the Government by attempting to reveal information that might be helpful to the Government in making further arrests in the drug-trafficking field. Whether it [was fruitful] or not is immaterial at this stage as far as this Court is concerned. The fact is he did have good faith.

In connection with rehabilitation, the judge observed only:

> I consider the fact that the defendant attempted to rehabilitate himself in the past year, went to several halfway houses and rehabilitation centers to make a new life for himself and to turn himself away from drug addiction and is continuing to go about that course of action.

> \*    \*    \*    \*    \*    \*

> ... I [will] ... at least give him some credit for what he had attempted to do in the past year.

We measure these grounds against the *Diaz–Villafane* benchmark.

### B. *Defendant's Cooperation.*

At the first furculum of the *Diaz–Villafane* test, our review is plenary. *See Aguilar–Pena,* 887 F.2d at 350; *Diaz–Villafane,* 874 F.2d at 49. Sklar's cooperation with the government stumbles on this prong. U.S.S.G. § 5K1.1 provides that:

> *Upon motion of the government* stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

U.S.S.G. § 5K1.1 (emphasis supplied). We have held, squarely and recently, that this

Table). Thus, the district court's conservative estimate of the cocaine attributable to Sklar was

50 grams higher than the minimum necessary to animate that base offense level.

guideline is constitutionally sound, *United States v. LaGuardia*, 902 F.2d 1010, 1013–17 (1st Cir.1990), and that it "forestall[s] any attempt to use an accused's substantial assistance as a springboard for downward departure except in cases where the prosecution has moved for such a dispensation." *Ocasio*, 914 F.2d at 333. *Accord United States v. Bruno*, 897 F.2d 691, 695 (3d Cir.1990); *United States v. Taylor*, 868 F.2d 125, 126 (5th Cir.1989).

■ Here, no government motion was filed. Moreover, there was absolutely no showing of any productive assistance, only an unrequited offer of help. An accused's professed desire to aid the government, without more, does not take a case outside the heartland or warrant a downward departure.[6] After all, as we noted in *LaGuardia*, "because the guidelines addressed departures for substantial assistance in section 5K1.1, departures for the same reason cannot be sustained under the generic [departure provisions of the guidelines]," at least in an ordinary case. 902 F.2d at 1017 n. 6.

### C. *Defendant's Rehabilitation.*

Apart from substantial assistance, departures must be considered under U.S.S.G. § 5K2.0. Analytically, we read this guideline as presenting two avenues that can lead to a valid departure. One avenue is qualitative: a district court may depart if it finds an aggravating or mitigating circumstance "of a kind" not considered by the Sentencing Commission in formulating the guidelines. The other avenue is quantitative: a district court may depart if it finds a material circumstance which, although considered by the Sentencing Commission, is present "to a degree" neither readily envisioned nor frequently seen in connec-

tion with the offender and/or the offense of conviction. *See* 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0, p.s.; *see also United States v. Williams*, 891 F.2d 962, 964 (1st Cir.1989).[7] We turn, then, to the question of whether either avenue can accommodate a downward departure for rehabilitation. Thereafter, we ponder the circumstances of Sklar's case.

1. *Rehabilitation as a Ground for Departure.* It is crystal clear that Congress largely rejected rehabilitation as a direct goal of criminal sentencing under the guidelines. *See* 28 U.S.C. § 994(k) (1988) ("The [Sentencing] Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant...."); *see also Mistretta v. United States*, 488 U.S. 361, 367, 109 S.Ct. 647, 652, 102 L.Ed.2d 714 (1989) (the enabling legislation "reject[ed] imprisonment as a means of promoting rehabilitation"). The Commission knew of this conclusion and, we believe, honored it. *See, e.g.*, U.S.S.G. Ch. 1, Pt. A, intro., 3., p.s. (discussing purposes of criminal punishment and the Commission's efforts to reconcile the tension between the retributive "just deserts" philosophy and the rehabilitative philosophy of "crime control").

■ Post-arrest/pre-imprisonment rehabilitation is, of course, a horse of a somewhat different hue.[8] Yet we, and other circuits, have had scant difficulty in concluding that, consistent with the "just deserts" philosophy, a penitent defendant's "posture of rehabilitation" or sincere "desire to change his life," was accorded only small weight by the Commission, which seems to have factored presentence rehabilitation into a two level reduction in the offense level for acceptance of responsibili-

---

**6.** A district court is, of course, free to consider a defendant's good faith and his cooperative attitude, even in the absence of a section 5K1.1 motion, "in determining what sentence *within* the guideline range should be imposed." *LaGuardia*, 902 F.2d at 1013 n. 4.

**7.** Whether qualitative or quantitative, the circumstance must have weight, that is, it must be sufficiently portentous to move the case out of the heartland for the offense of conviction. *See*

*Aguilar–Pena*, 887 F.2d at 350 (to warrant departing, circumstance must be such as to "distinguish[ ] the case from the mine-run for that offense"); *see also Williams*, 891 F.2d at 967 (discussing need for "meaningful atypicality").

**8.** For ease in reference, we shall henceforth refer to rehabilitation during the period between a defendant's arrest and the imposition of sentence as "presentence rehabilitation."

ty under U.S.S.G. § 3E1.1. *See, e.g., United States v. Studley*, 907 F.2d 254, 259 (1st Cir.1990); *United States v. Van Dyke*, 895 F.2d 984, 987 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 112, 112 L.Ed.2d 82 (1990). To assume that there was a qualitative failure—an oversight in not featuring presentence rehabilitation more prominently in the guidelines—beggars credulity. *Cf. United States v. Pozzy*, 902 F.2d 133, 139 (1st Cir.1990) (defendant's pregnancy held not to be a factor warranting downward departure; Sentencing Commission must have been "fully aware that some convicted female felons are pregnant at the time of sentencing"). Thus, the mere fact of demonstrated rehabilitation between date of arrest and date of sentencing cannot form the basis for a downward departure from the GSR. *See, e.g., Studley*, 907 F.2d at 259; *Williams*, 891 F.2d at 966.[9]

To say that a defendant's presentence rehabilitation will not support a qualitative departure, however, is not to say that such rehabilitation, if significantly unusual in a given case, may not constitute a basis for a quantitative departure. Our cases appear to leave open that possibility, *see, e.g., Studley*, 907 F.2d at 259 (invalidating downward departure because defendant's posture of rehabilitation was not extraordinary); *Williams*, 891 F.2d at 966–67 (vacating downward departure because, *inter alia*, defendant's rehabilitative efforts were not meaningfully atypical), and other courts have leaned in that direction, *see, e.g., United States v. Maddalena*, 893 F.2d 815, 817 (6th Cir.1989) (district court may, but need not, consider defendant's efforts to stay away from drugs as a basis for downward departure); *United States v. Rodriguez*, 724 F.Supp. 1118, 1119 (S.D.N.

Y.1989) (district court departs downward based on defendant's exceptional rehabilitative progress over extended period of time preceding imposition of sentence); *but see Van Dyke*, 895 F.2d at 987 (defendant's presentence rehabilitation permits a reduction for acceptance of responsibility, but is not a proper basis for downward departure).[10] We continue to believe that, in an appropriate case, a defendant's presentence rehabilitative efforts and progress can be so significant, and can so far exceed ordinary expectations, that they dwarf the scope of presentence rehabilitation contemplated by the sentencing commissioners when formulating section 3E1.1. We hold, therefore, that a defendant's rehabilitation might, on rare occasion, serve as a basis for a downward departure, but only when and if the rehabilitation is "so extraordinary as to suggest its presence to a degree not adequately taken into consideration by the acceptance of responsibility reduction." *Studley*, 907 F.2d at 259.

Let us be perfectly clear. We think that merited downward departures for rehabilitation are likely to be few and far between. That is so because, "[i]f the guidelines are to provide a coherent system of criminal sentencing, the trial court's right to depart, up or down, must be restricted to those few instances where some *substantial* atypicality can be demonstrated." *Williams*, 891 F.2d at 967 (emphasis supplied). Some degree of presentence rehabilitation is usually to be expected from a penitent defendant, or one who genuinely shoulders responsibility, or even from one who simply wants to put his best foot forward at sentencing, hopeful of lightening the load. Moreover, some degree of presentence rehabilitation will occur merely because a

9. Even where a posture of rehabilitation will not adequately bottom a downward departure, it remains a factor which a district court can take into account in determining where a defendant's sentence should fall within the GSR.

10. *Van Dyke* must be read in the dappled light cast by *United States v. Braxton*, 903 F.2d 292 (4th Cir.1990). There, the Fourth Circuit rejected a district court's statement that the purpose of the acceptance of responsibility reduction under U.S.S.G. § 3E1.1 is to promote rehabilita-

tion and, therefore, a defendant incapable of rehabilitation is not entitled to such a reduction. The court of appeals wrote that "rehabilitation is not a factor in the consideration of acceptance of responsibility." *Id.* at 296. Arguably, however, *Van Dyke* and *Braxton* are reconcilable. The later case may be read as holding only that a defendant's ability to rehabilitate is not a *sine qua non* for the acceptance-of-responsibility reduction (which may be awarded for other exemplary conduct).

defendant, to keep his temporary liberty, abides by fairly typical conditions of pretrial release. Yet such predictable reactions, while laudable, fall well shy of what we believe is necessary to take cases out of the heartland. It is only the occasional instance, where time and circumstances permit and the accused takes full advantage of both, that will produce rehabilitation so dramatic as to cross the boundary. Thus, we recognize that departures will always remain—as well they should—"the exception, not the rule." *Aguilar–Pena*, 887 F.2d at 350.

■ 2. *The Case at Bar.* We cannot accept the sentencing judge's determination that this case constitutes such an exception. Sklar's rehabilitative endeavors, though carried out in a conscientious fashion, were largely prompted by the specific mandates of his pretrial release agreement (requiring *inter alia* completion of a detoxification program, abstinence from drug use, and acquisition of gainful employment). To cite but one example, Sklar's successful completion of a residential substance abuse program, especially given the explicit directives of the pretrial release conditions, seems too fragile to carry the weight that the lower court assigned to it. After all, it is well settled that a defendant's efforts to overcome his drug addiction, while certainly commendable, will ordinarily not support a downward departure. *See United States v. Pharr*, 916 F.2d 129, 133 & n. 5 (3d Cir.1990); *Williams*, 891 F.2d at 965. This case seems insufficiently out of the ordinary to jettison that rule. The other events reflected in the record were, similarly, not circumstances which, standing alone, warranted sentencing outside the guidelines. Thus, to illustrate, while we admire Sklar's maintenance of his resolve in the face of his mother's untimely death, we cannot sustain a downward departure on that basis. *See* U.S.S.G. § 5H1.6, p.s. (family ties are not ordinarily relevant in departure context); *Pozzy*, 902 F.2d at 139 (same).

We understand why the district court, believing that Sklar's efforts to reform and the success he achieved toward that end

deserved "some credit," essayed a modest downward departure. But, no matter how humanitarian the court's views may seem, or "how steeped in real-world wisdom" its decision may have been, *Aguilar–Pena*, 887 F.2d at 353, there was not enough in this case to view it as presenting successful presentence rehabilitation to a degree beyond what the Sentencing Commission likely anticipated in formulating the section 3E1.1 credit for acceptance of responsibility and in allowing the court flexibility to sentence at the low end of the GSR.

We do not mean to imply that rehabilitative progress should be ignored solely because it coincides with conditions of pretrial release; or that factors, inadequate to warrant departure when taken in isolation, may not in combination suffice to remove a case from the heartland, *cf., e.g., Bourjaily v. United States*, 483 U.S. 171, 179–80, 107 S.Ct. 2775, 2780–81, 97 L.Ed.2d 144 (1987) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts."); or that such factors, singly or in the ensemble, may not tend to indicate the existence of meaningfully atypical rehabilitation. Our holding is considerably narrower and more fact-specific; reduced to simplest terms, the record before us fails to show a collocation of circumstances unusual enough to merit disregarding the guidelines. The downward departure cannot stand.

IV. CONCLUSION

We need go no further. For the reasons stated, we reject the defendant's appeal but sustain the government's appeal.

*Affirmed in part, reversed in part, and remanded for resentencing within the guideline sentencing range, before the same district judge.*