955 F.2d 43
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Henry RINEHART, Jr., Defendant-Appellant.
 No. 90-5218.
 United States Court of Appeals, Fourth Circuit.
 Argued July 12, 1991.
Decided Feb. 24, 1992.
As Amended April 2, 1992.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Charles H. Haden, II, Chief District Judge. (CR-89-247-2-1)
 Argued: Charles R. Garten, Charleston, W.Va., for appellant; Jacquelyn Irwin Custer, Assistant United States Attorney, Charleston, W.Va., for appellee.
 On Brief: Michael W. Carey, United States Attorney, Hunter P. Smith, Jr., Assistant United States Attorney, Charleston, W.Va., for appellee.
 S.D.W.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and SPROUSE, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Henry Rinehart appeals his conviction and sentence on several drug charges. We find no reversible error in either and affirm.
 
 
 2
 * The facts of this case are relatively simple and occurred over the course of a brief period of time. On October 21, 1989, Rinehart, concededly a crack addict, met Sharon Erby at his sister Michelle's home. Rinehart sold Erby one rock of cocaine base (estimated at about .25 grams) for fifty dollars. Two days later, Rinehart went to Erby's residence and apparently traded her a rock of cocaine for some intravenous drug equipment. On October 27, Rinehart returned to Erby's residence with a sixteen year old male, Jody Ball. Rinehart and Erby then went to Sandra Hudnall's home where the three used cocaine provided by Rinehart. Erby then obtained additional needles from Hudnall. Rinehart testified that he and Erby then shot up additional crack.
 
 
 3
 Rinehart inquired if Erby knew of anybody who would want to purchase crack. Erby called Virginia Straughter who proceeded to visit Erby's residence for the purpose of buying drugs. Before coming to Erby's house, however, Straughter--who was cooperating in a local drug undercover operation--called the police and was equipped with a body wire. Upon arriving at Erby's home, she purchased .73 grams of cocaine from Erby. Erby gave Straughter's marked money to Rinehart who in turn provided Erby the desired cocaine. Rinehart then passed the marked bills on to Jody Ball. Straughter left the house shortly after the transaction, on her way out observing Rinehart with a needleworks.
 
 
 4
 After leaving the scene of the transaction, Straughter contacted the police drug unit. The police then went to the Erby residence. When they entered the residence, the police found Rinehart in the process of injecting himself with cocaine. A subsequent search revealed 2.28 grams of cocaine in Rinehart's hat. Rinehart was charged in a sixcount indictment with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846; two counts of distribution of cocaine, in violation of 21 U.S.C. § 841(a); two counts of distribution of cocaine within 1000 feet of a school, in violation of 21 U.S.C. # 8E8E # 841(a)(1), 845(a), and 18 U.S.C. § 2; and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.
 
 
 5
 At trial, the government presented the testimony of Straughter and Erby, among others. Rinehart testified in his own defense, denying that he had ever sold crack. He admitted, however, that he was a crack cocaine user. The jury returned a verdict of guilty on all charges.
 
 
 6
 Shortly after Rinehart's conviction, but before his sentencing, an unrelated investigation led to the arrest of an Andre Brown, an acquaintance of Rinehart's from the Charleston community. Shortly after his arrest, Brown offered to testify against Rinehart in exchange for a lenient treatment by the prosecution. Under the deal offered by the prosecution, Brown was charged with possession of .58 grams of crack but was not charged, as he might have been, with possession, distribution, or conspiracy charges associated with the fact that he had transported at least seven ounces of cocaine across state lines nor with carrying a loaded weapon in the course of a drug transaction. Brown's exposure for the minimal charges ultimately brought against him was approximately two years.
 
 
 7
 Thereafter, at Rinehart's sentencing hearing, Brown testified that he met Rinehart in July 1989 when Brown and Rinehart's brother brought a quantity of cocaine powder to Charleston from Maryland. Brown stated that Rinehart then converted the powder to cocaine base and distributed the product. Brown further testified that on three occasions he and Rinehart had travelled to Cleveland to purchase cocaine, returned to Charleston, and converted it to crack. He testified that he and Rinehart had brought a total of about seven ounces of cocaine into Charleston from Cleveland on three occasions. He did not give the dates on which these trips had occurred, other than to say that the last one had occurred a week or two before Rinehart's arrest. Although he admitted that he had not actually seen Rinehart do so, Brown claimed that Rinehart converted the cocaine to crack. He also stated that Rinehart distributed some of this crack.
 
 
 8
 On cross-examination, the defense explored Brown's prior inconsistent statements, as well as his personal involvement with the women in Rinehart's life. A principal inconsistency in his testimony was that during both his initial statements to the prosecutors, and again before the grand jury, Brown had stated that his first trip with Rinehart occurred in November 1989. By November, Rinehart had already been incarcerated for the offense at issue here. Brown explained the critical discrepancy by his recollection's having changed only after a police officer in the Cabell County Jail informed him that "I must have possibly had my dates wrong at the time." In his testimony, however, Brown never assigned new dates for when these trips actually occurred, asserting only that the last trip had occurred a week or two prior to Rinehart's arrest. In his first statement to government agents, he had claimed that he had not even been present for the first alleged trip to Cleveland. He later changed his mind. Before the grand jury, Brown also had testified about an additional trip to Maryland to acquire drugs. He abandoned this story upon cross-examination.
 
 
 9
 Brown further insisted that he was not a crack dealer. He claimed that he was a "chauffeur" and at times an economic contributor, but that he was virtually uninvolved in the purchase and distribution of the product. Over the course of his testimony, and then again in the testimony of others, it became clear that Brown had been lying about his "minimal" role in the distribution of drugs and that he was instrumentally involved in both the buying and selling of substantial amounts of cocaine.
 
 
 10
 Brown also was intertwined in the personal life of Rinehart. He admitted having engaged in sexual relations with two of Rinehart's sisters, Lisa Jones and Michelle Rinehart. He also conceded that he had had sex with Rinehart's finance, Christine Hart, and listed her address as his residence when he was released on bond. Finally, Brown was at Rinehart's sister Lisa's house when he was arrested and he testified that he blamed Lisa personally for calling the police and causing him to be detained.
 
 
 11
 The government also presented the testimony of Michael Goff, a forensic drug chemist. He testified that the conversion of cocaine powder to crack results in approximately eleven percent loss of total weight.
 
 
 12
 Rinehart presented the testimony of Michelle Rinehart and Alice Jordan at sentencing. Jordan testified that Brown was the unmistakable ringleader in a drug sale operation and that Rinehart was working for him. She stated that Brown had specifically told her that Rinehart was working for him. She also noted Brown's conspicuous wealth in the form of expensive jewelry, clothing, and a new automobile. Rinehart did not testify at sentencing.
 
 
 13
 The district court credited Brown's testimony and determined that Rinehart was responsible for bringing about seven ounces of cocaine powder into Charleston and converting it into crack. The court then determined that this behavior constituted relevant conduct for the purposes of § 1B1.3 of the Sentencing Guidelines, concluding that those trips and the subsequent distribution of crack constituted "acts or omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Relying on the testimony of an expert chemist, the court concluded that Rinehart had trafficked in between 50 and 150 grams of crack. This yielded a base offense level of 32. The court also found that Rinehart was the leader of the distribution scheme, justifying a two level sentencing increase. Finally, the court found that Rinehart had perjured himself during his trial testimony and was thus subject to a two-level enhancement for obstruction of justice.* Rinehart was sentenced at level 36, and received a sentence of 262 months.
 
 
 14
 This appeal followed.
 
 II
 
 15
 We first consider several assignments of error related to Rinehart's conviction.
 
 
 16
 * The first is that the court erred in granting the government's motion for a one-day extension in which to file an indictment outside the period allowed by the Speedy Trial Act.
 
 
 17
 Under that Act, a defendant is entitled to have an indictment filed within 30 days of his arrest and detention. Rinehart was arrested and detained on October 27, 1989. On November 24, the government filed a motion for an extension of time in which to obtain an indictment. The indictment was returned on November 28, 1989. On November 28, 1989, the court entered an order nunc pro tunc, granting a one-day enlargement of time. The court found that the extension would serve the ends of justice and would not prejudice the defendant.
 
 
 18
 Rinehart focuses on the court's nunc pro tunc order, but it was not actually needed to avoid violation of the Speedy Trial Act. When the United States Attorney filed a motion for extension of time prior to the lapse of the 30-day indictment period, the ensuing pendency of that motion constituted excludable time as "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of such motion." 18 U.S.C. § 3161(h)(1)(F). Once the government timely filed this motion, the Speedy Trial Act time period was tolled so that the indictment's filing was timely under the Act.
 
 B
 
 19
 Rinehart next argues that the court erred in denying his motion to dismiss the indictment on the ground that it was based on perjured testimony before the grand jury. There was no basis for the court to conclude that anyone had perjured himself before the grand jury and the district court's decision denying the motion was not error.
 
 C
 
 20
 Rinehart contends that, because his supposed co-conspirator was an informer for the government, his indictment must be dismissed under United States v. Lively, 803 F.2d 1124 (11th Cir.1986), in which the court held that a person cannot conspire with a government informer who intends to frustrate the conspiracy. At the time of this conspiracy, however, Erby was not an informer. She only decided to testify after the incident that gave rise to this indictment. This claim therefore fails.
 
 D
 
 21
 Rinehart next contends that the court erred in admitting the tape recording produced when Straughter wore a wire to her cocaine buy. The record was apparently quite poor and, in fact, the court refused to admit a written transcript, finding it too suggestive and inaccurate. Chiefly, Rinehart argues that the quality was so poor that his identity was virtually impossible to detect on the tape. However, as the government points out, the tape is admissible as the statement of a coconspirator (Erby) to Straughter. Thus, even if the recording did not include any statements by Rinehart, it is still admissible. Admission of the recording was not an abuse of discretion.
 
 E
 
 22
 Rinehart finally contends that the trial judge erred in failing to recuse himself for bias, and that he received ineffective assistance of counsel. He can, however, point to no basis in the record for either claim of error. No evidence of judge-bias supports Rinehart's belief that it existed. The district court found that assigned counsel was "abundantly and truly effective in the representation of his client." This finding was not clearly erroneous.
 
 III
 
 23
 We next consider a number of assignments of error in the sentencing process.
 
 
 24
 * Rinehart first challenges the court's determination that, pursuant to the "relevant conduct" provisions of the Sentencing Guidelines, U.S.S.G. § 1B1.3(a)(2), he should be held accountable not only for the relatively small amount (three or four grams) of cocaine base proved in relation to the offenses of conviction, but also for a significantly larger amount (increasing the total to 50-150 grams) attributable to the conduct of a wider conspiracy in which the court found him to have been involved with Andre Brown.
 
 
 25
 Rinehart's challenge is essentially a two-pronged one: to the credibility of Brown's testimony upon which the district court's finding of a wider conspiracy was largely based, and to the determination that such a conspiracy was, in any event, "relevant conduct" within the meaning of § 1B1.3(a)(2).
 
 
 26
 The district court's determination on this issue, including the credibility of Brown's critical testimony, is a factual determination that we must uphold unless we can declare it clearly erroneous. Although both aspects of the determination raise problems, particularly Brown's credibility, we cannot do that. Brown's testimony, although vague as to dates and some other details of the conspiracy, and obviously self-serving to a highly successful degree (in view of the sentence which his cooperation gained for him), was not so internally inconsistent or manifestly incredible on its face as to permit our rejection of the district court's acceptance of its credibility. See Anderson v. Bessemer City, 470 U.S. 564, 575 (1985). It was not directly contradicted in any material respect by Rinehart's lone witness at sentencing; nor by Rinehart, who did not then testify.
 
 
 27
 If Brown's account of the conspiracy's existence and form are accepted, it obviously included conduct within the Guideline definition of "acts or omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction," as generally interpreted by the courts. That is to say, it involved conduct closely related to--indeed overlapping--the offenses of conviction, in both temporal and spatial terms, and it involved the same type of conduct, directed at the same class of victims--drug procurement, processing, and distribution in the Charleston, West Virginia area--rather than merely generally comparable criminal activity, see United States v. Sklar, 920 F.2d 107, 110-11 (1st Cir.1990).
 
 
 28
 Although the result of drawing in so widened a scope of criminal activity, hence chargeable drug amounts, into this sentencing process was a significant increase in the sentencing range beyond that to which the offense of conviction alone exposed Rinehart (from level 22 to level 32), such a result is exactly that generally contemplated by § 1B1.3(a)(2), and we can find no error in the particular result here.
 
 B
 
 29
 Rinehart's next challenge is to the court's increase of his offense level by finding, pursuant to § 3B1.1, that he served in a leadership role in the sense contemplated by the Guidelines.
 
 
 30
 Rinehart's contention essentially is that the district court's role finding was erroneously based entirely on Brown's testimony at sentencing about conduct other than that charged, that is, on the "relevant conduct" found, rather than solely on the offenses of conviction. We think it not at all clear that this was the basis for the court's determination. There was ample evidence in the trial record of Rinehart's leadership role vis-a-vis Erby and Ball to support a finding limited to his leadership role in the specific offenses of conviction. In any event, however, this court has held that a defendant's role in the offense is determined with reference to the entire scope of any relevant conduct found, not just to participation in the offense of conviction. United States v. Fells, 920 F.2d 1179 (4th Cir.1990). Here, though the evidence of Rinehart's role in relation to Brown's in the wider relevant conduct-conspiracy is not altogether clear, the district court's finding that Rinehart at least shared with Brown a leadership role in that conduct is not clearly erroneous.
 
 C
 
 31
 The next challenge is to the district court's calculation of the amount of cocaine base properly attributable to Rinehart for sentencing purposes under § 2D1.1(c)(6).
 
 
 32
 The court started with a finding that Rinehart and his various coconspirators in the wider "relevant conduct" conspiracy had acquired at least seven ounces of powder cocaine of unknown purity to be used in their distribution scheme. Because the indictment charged conspiracy to distribute cocaine base, the court next addressed how much base the powder produced for distribution. Based on Brown's testimony from direct observation of the "cooking" process which produced a smaller amount of "base" from the starting quantity of powder, and an expert's opinion about the general process, the court came up with an approximation of something more than 50 but less than 150 grams of cocaine base. Such approximations are expressly authorized, because practically necessary, by the Guidelines. See § 2D1.4, comment (n. 2).
 
 
 33
 A review of the record here demonstrates that the court's approximation, based upon the evidence concerning "precursor" powder amounts and the "cooking process" employed, was an entirely plausible one, indeed a conservative one. As such it constitutes a finding of fact that is not clearly erroneous and must therefore be affirmed.
 
 D
 
 34
 Rinehart finally seeks review of the district court's refusal to grant a downward departure based upon the disparity between his and Brown's sentences. This discretionary ruling is not subject to appellate review. United States v. Bayerle, 898 F.2d 28, 30 (4th Cir.1990).
 
 IV
 
 35
 Finding no reversible error among those assigned by Rinehart to his conviction and sentence, we affirm.
 
 
 36
 AFFIRMED.
 
 
 
 *
 Although Rinehart challenges the court's determination that he was a leader of the drug operation, he does not challenge the court's obstruction of justice enhancement