**UNITED STATES of America, Plaintiff,**

v.

**Brian J. HOLLINS, Defendant.**

**No. 1:92CR0293.**

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 19, 1994.

David A. Sierleja, U.S. Atty., for U.S.

Debra Hughes, Federal Public Defender, Cleveland, OH, for defendant.

## SENTENCING MEMORANDUM

ANN ALDRICH, District Judge.

On May 6, 1993, defendant Brian J. Hollins pleaded guilty before this Court to five counts of bank robbery, in violation of Title 18 Section 2113(a) of the United States Code. The defendant is now before this Court for sentencing.

Hollins moves this Court for a downward departure from the federal sentencing guidelines. Without a downward departure, the proposed adjusted offense level is 23, criminal history category I. This Court conducted an evidentiary hearing on Hollins's motion on November 4, 1993.

For the reasons stated below, this Court finds that the defendant has demonstrated circumstances not contemplated by the Federal Sentencing Commission. Accordingly, this Court grants Hollins's motion for a downward departure.

### I.

#### A. Background.

During a six-week period from February 1, 1991, to March 14, 1991, Brian Hollins committed seven bank robberies in Cuyahoga County while he was addicted to cocaine. None involved a weapon; each time, Hollins simply handed a note, demanding money, to the bank teller. After the seventh robbery, which took place at Shaker Square in Cleveland, Ohio, Hollins was arrested and implicated in all seven robberies.

The Cuyahoga County prosecutor indicted Hollins only for the final robbery, which took place on March 14, 1991. On June 3, 1991, Hollins pleaded guilty in Cuyahoga County Common Pleas Court. He received a "diver-sionary disposition," under O.R.C. 2951.041(H), and was sentenced to a 30–day inpatient drug rehabilitation program. Hollins successfully completed that program at a facility called Turning Point. His state conviction was expunged in March of 1992.

It is unclear whether the state court judge knew of the other six bank robberies when he gave Hollins a diversionary disposition for the one-count indictment. Counsel for the defendant represents to this Court that Hollins's defense attorney in the state proceeding remembers that more than one robbery was taken into account in the state plea bargain; the defendant testified that he remembers being advised by his then-lawyer that his state plea would take care of all the robberies. The government represents that their investigation indicates that the sentencing judge only knew of the one robbery in the state indictment. Counsel for the defendant has been unable to access the state court records for the expunged conviction to obtain any further information.

On September 2, 1992, (fifteen months after Hollins' state robbery conviction) a federal grand jury indicted Hollins in the instant case, for seven counts of bank robbery. Before seeking the indictment, the prosecution obtained authorization from the United States Attorney General, consistent with the Department of Justice's "*Petite* policy" regarding dual prosecutions. Hollins pleaded guilty to five counts of bank robbery in May, 1993, as part of a plea agreement.

#### B. Downward Departure Hearing.

This Court conducted an evidentiary hearing on Hollins's motion for a downward departure on November 4, 1993. The following are this Court's relevant factual findings from that hearing.

Brian Hollins testified that at the time he committed the bank robberies, he was addicted to crack cocaine. Hollins had begun his cocaine habit in 1989. Although Hollins had a job as a "helper" at the Cleveland Packaging Corporation, his cocaine habit was costing him $500–600 per day. In January, 1991, Hollins was told by his father to move out of his father's house by February 1st. On Feb-

ruary 1st, Hollins robbed the first bank. Hollins testified that he went on the bank robbery spree to support his habit and so that he could afford to move out.

Pursuant to his state court sentence, Hollins successfully completed a 30–day drug rehabilitation program. He also followed the recommendations of the rehabilitation program discharge summary: participation in an "aftercare" program at Southwest General Hospital, and participation in "Narcotics Anonymous." As of November, 1993, Hollins still attended twice or three times per week Alcoholics Anonymous ("AA") meetings, which he could attend more often, given his work schedule, than the almost identical Narcotics Anonymous meetings.

Hollins testified that he has a "sobriety date" of March 14, 1991, the day he was arrested. Hollins has been randomly tested for drugs monthly since September, 1991. On January 19, 1993, his urinalysis tested positive for cocaine. Hollins, who testified that he had been taking cold medicine at the time of that test, immediately notified his attorney and requested a retest of the sample, which tested positive a second time. Hollins denies he had taken any cocaine. Since that time, Hollins has been tested randomly twice monthly, and has had no more positive readings.

This Court finds credible Hollins's denial that he had taken cocaine in January, 1993. Hollins had been tested randomly for several months prior to the positive reading, and has been tested twice monthly since, without any positive results. Hollins's behavior after the positive reading, immediately calling his attorney and asking for a retest of the sample, is also consistent with his insistence that he had not taken cocaine. Finally, this Court found Hollins's demeanor while testifying at the hearing consistent with a finding of credibility. Hollins has satisfied this Court that he has been drug free for almost three and a half years.

After his arrest, Hollins returned to college [1] in pursuit of an "associate of applied science" degree. At the time of the downward departure hearing, Hollins was in his fifth quarter of the two-year degree at Cuyahoga Community College ("Tri–C"), and planned to complete the degree, with a specialty in the area of "Chemical Dependency," in June, 1994.

Shirley Griffin, one of Hollins's instructors at Tri–C, testified on his behalf. Griffin indicated that during Hollins's time in her department of community mental health, he showed a steady increase in his focus and organization. His writing and work quality improved greatly over the duration of the course. According to Griffin, Hollins had shown more persistence than many of her students at Tri–C, who often tend to struggle initially and give up.

As part of his degree program, Hollins performed "field work" as a drug counsellor at a Cleveland facility called Exodus. Griffin indicated that Hollins dealt with a difficult patient population; most of the men at Exodus are there unwillingly, as a result of a court order. Griffin characterized Hollins's performance in his field work as "remarkable progress"; he "has grown by leaps and bounds" as he has developed his counselling skills and been given increasing responsibilities. Griffin feels someone like Hollins is uniquely suited to such drug counselling work, given his experience. As she put it, "we need Brian to stand up and say 'it's not a good idea and I can tell you why.'"

At the time of the hearing, while Hollins had been handling classes and spending more than 14 hours per week at Exodus house, he had simultaneously held a "work study" job at Tri–C. Sharyn Sanders, his supervisor at Tri–C's "Unified Technologies Centers" ("UTC") also testified on Hollins's behalf. As of November, 1993, Hollins had worked for UTC for one and one-half years, and Sanders had given him increasing responsibility each semester. Sanders had known for some time that Hollins was convicted of bank robbery. Sanders indicated Hollins was one of the best work-study students she has ever had. He often worked five days a week, for a total of twenty hours per week. Hollins was always on time, had only missed work a few times in one and one-half years, and had

---

**1.** Hollins had tried one unsuccessful semester at Cuyahoga Community College in 1983.

always called ahead if he could not be there. Sanders indicated that his attendance was better than that of her full-time employees.

Sanders relied on Hollins to quality-check computer training manuals put out by UTC, to move equipment, and to train other work-study students. Sanders testified that although she is generally satisfied with her group of work-study students, the group is usually a "mixed bag." However, she found Hollins mature and responsible from the beginning. At the time of the hearing, Hollins worked without supervision, and was one of only three people given the code to the computer "keypad" securing the room which contained one million dollars worth of computer equipment. The only other work-study student ever trusted with the keypad code is now a full-time employee of UTC. Sanders characterized Hollins as experienced and responsible, and willing to "bend over backwards" for her at work. Sanders had requested that her department set aside money in the budget to hire Hollins again at least as a part-time employee in 1994.

### C. Conduct Since November, 1993

This Court appointed Dr. David Pincus, D.M.H., a clinical psychologist, to evaluate Brian Hollins in April, 1994, to determine Hollins's likelihood of recidivism for the crime of bank robbery. After five sessions with Hollins, and conversations with several members of Hollins's family, Dr. Pincus submitted a report to this Court in May, 1994. Dr. Pincus concluded that Hollins was an unlikely candidate for recidivism, particularly if Hollins is given a chance to work through his psychological problems, which appear to have led to his crimes, through mandatory ongoing psychological counselling.

Brian Hollins has submitted 44 random urine samples for drug testing since September, 1991. The January, 1993 test was the only sample which tested positive for cocaine.

Hollins graduated from Cuyahoga Community College with a two-year Associate's Degree in Applied Science, Community Health/Chemical Dependency in June, 1994. He has been accepted as a full time student at Wilberforce University in Wilberforce, Ohio beginning in the fall quarter of 1994.

### II.

Hollins moves for a downward departure from the federal sentencing guidelines on two grounds. Hollins argues that the prejudice resulting to him from the federal government's delayed decision to prosecute him, for conduct of which the state authorities were aware, was not foreseen by the Federal Sentencing Commission. He also argues that his efforts to rehabilitate his drug dependent lifestyle provide additional grounds for a downward departure.

The government points out that the federal prosecution followed the letter of the *Petite* policy in this case, and argues that the treatment of the offense by the state court merits a successive prosecution. The government emphasizes that Hollins's participation in drug rehabilitation was court-ordered. The government also argues that Hollins was only doing what the system expects of defendants; Hollins's conduct, the government says, is already accounted for in the sentencing guidelines.

### A. The Standard for Downward Departure.

A sentencing court may impose a sentence outside the range established by the sentencing guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see also* United States Sentencing Commission Guidelines Manual § 5K2.0 (revised ed. 1992).

The Sentencing Commission recognized the central role played by the sentencing court in considering downward departures. "The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing." *Id.*

### B. The Petite Policy and Extraordinary Conduct.

■ In 1959, the federal government adopted a policy against dual state and feder-

al prosecution of the same offense. *See Petite v. United States,* 361 U.S. 529, 530–31, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960) (*per curiam* ). The "*Petite* policy" precludes the initiation or continuation of dual state and federal prosecutions based on substantially the same act, acts, or transaction unless there is a compelling federal interest in a federal prosecution. Under the policy, federal prosecutors must obtain authorization from the Attorney General for an action falling within the terms of the policy.

The Justice Department statement of the *Petite* policy specifies that one purpose of the policy is to "regulate prosecutorial discretion in order . . . to protect persons charged with criminal conduct from the unfairness associated with multiple prosecutions and multiple punishments for substantially the same act or acts." *See* Department of Justice Manual § 9–2.142; *see also Rinaldi v. United States,* 434 U.S. 22, 27–29, 98 S.Ct. 81, 84–85, 54 L.Ed.2d 207 (1977).

The Sixth Circuit has held that it is within the discretion of the sentencing court to consider a defendant's efforts to stay away from drugs as a basis for departing from the federal sentencing guidelines. *United States v. Maddalena,* 893 F.2d 815, 818 (6th Cir.1989), *cert. denied* —— U.S. ——, 112 S.Ct. 233, 116 L.Ed.2d 190 (1991). This position is shared by the Second Circuit, which has held that allowing downward departures for some rehabilitative conduct is consistent with Congress's mandate that sentencing judges consider " 'providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.' " *United States v. Maier,* 975 F.2d 944, 946 (2d Cir.1992), citing 18 U.S.C. § 3553(a)(2)(D).

Several other circuits addressing the question of rehabilitative conduct have allowed its consideration for a downward departure, but have limited departures to those situations involving "extraordinary" conduct by a defendant. In *United States v. Sklar,* the First Circuit held that drug rehabilitation " 'so extraordinary as to suggest its presence to a *degree* not adequately taken into consideration by the acceptance of responsibility reduction' " could justify a departure. 920 F.2d 107, 115 (1st Cir.1990), citing *United States v. Studley,* 907 F.2d 254, 259 (1st Cir.1990); *see also United States v. Williams,* 948 F.2d 706 (11th Cir.1991); *United States v. Harrington,* 947 F.2d 956, 962 (D.C.Cir.1991). These courts have limited downward departures on the basis of recovery from drug dependency to those situations where some "substantial atypicality" has been demonstrated. *United States v. Williams,* 891 F.2d 962, 967 (1st Cir.1989).

The Sixth Circuit has not spoken specifically to other types of rehabilitative conduct which might fall outside the contemplation of the guidelines.

### III.

This case is, without a doubt, "substantially atypical." In June of 1991, the state of Ohio chose to give Brian Hollins a chance to recover. The county prosecutor, with knowledge of Hollins's alleged involvement in seven bank robberies, all of which took place in Cuyahoga County, indicted Hollins for one robbery and later entered into a plea agreement with Hollins. The state court, whose knowledge of the other robberies is unclear, chose to give Hollins a diversionary disposition, by sending him to a drug rehabilitation facility instead of to prison. Hollins not only did what was required of him, but has gone much further in turning his life around.

Hollins acknowledges that the government has not proceeded in bad faith, and has technically complied with the *Petite* policy in this case. Deciding that the state's sentence of Hollins was too lenient, the federal government sought and received from the Attorney General authorization to bring the instant indictment. However, after the government had waited out the final disposition of Hollins's state case, and had secured authorization for the federal indictment, 15 months had passed since Hollins's state sentencing, and 18 months since the last bank robbery.

The mere fact that the *Petite* policy's technical requirements have been met does not mean that the spirit of the *Petite* policy was not violated in this case. The practical result of the delay in the federal government's decision to prosecute Hollins, even

though that delay was not a product of bad faith, is a very material prejudice to Brian Hollins. Hollins, who testified in this Court that he understood his state sentence to "take care of" all his offenses, complied with the state sentence successfully. He participated in an aftercare program, and continues to participate in AA meetings. Hollins then began to rebuild his life. He returned to college in pursuit of a degree. He began specific field work in a subject area, chemical dependency, in which he has a unique perspective as a former addict. He found a work-study position to help pay for his studies. During his time there, he became one of UTC's most trusted *employees,* let alone work-study students. He has discussed with his lawyer repaying the money he stole, although he has as of yet not found a way to do that.

Since this Court's downward departure hearing, Hollins has remained on track. He has continued to test negatively for drugs in random drug testing. He has been accepted for admission at Wilberforce University in Wilberforce, Ohio, and would like to pursue a degree there. Moreover, Dr. Pincus concluded that Hollins was an unlikely candidate for recidivism. In short, Brian Hollins is well on the way to being a productive, and valued, member of society.

The applicable sentencing range for Hollins, with no downward departure, is 46–57 months—almost four years in federal prison. The unfairness of the timing of the government's decision to prosecute is evident when this range is compared to the corresponding sentence under Ohio law: if Hollins had originally been prosecuted and sentenced in state court for *all seven* bank robberies, he would have been sentenced to a range of three to fifteen years in state prison, beginning in 1991. *See* Ohio Rev.Code § 2929.11(2)(a). In serving such a term, Hollins would have been eligible for parole at the expiration of the minimum term, diminished for good behavior. In other words, as long as Hollins demonstrated good behavior in prison, *Hol-lins would have been eligible for parole in late 1993, or early 1994, several months ago.*[2]

■ Because of the delay occasioned by the government's "wait and see" approach, however, and their ultimate rejection of the state's treatment of Brian Hollins's offenses, Hollins faces four years of prison *now*—29 months after his offense (the indictment itself was 18 months after the offense), after completion of an associates degree and acceptance to a four-year college, and in the midst of a laudable course of recovery. This Court finds such a result extremely prejudicial, and patently unfair to Hollins. Although this case does not present a violation of the letter of the *Petite* policy, it surely poses a violation of the *spirit* of the policy, whose purpose is to limit the prejudice to a defendant resulting from successive prosecutions for the same crime. A criminal defendant in Hollins's position is not only prosecuted twice, but would be serving two sentences for the same offense, extended over double the number of years, simply because the federal government is dissatisfied with the state's (successful) attempt at rehabilitation.

Moreover, this Court finds Hollins's course of recovery truly atypical. The government argues that in getting off drugs in a court-ordered rehabilitation program, achieving mostly As and Bs in college, gaining the utmost trust of his employer, showing remarkable persistence, understanding, and increased focus in his degree program, and being accepted for enrollment this fall at a four-year college Hollins has done nothing "extraordinary." The government gained the concession of the witnesses at the departure hearing that Hollins's behavior is what they "want" and "expect" from all of their students and employees. Each of those witnesses stressed, however, that the majority of their students and employees do not meet those standards, while Brian Hollins exceeded their expectations.

While as a society we may "expect" all citizens to stay away from drugs, get an education, and hold a job and while we may "hope" or "expect" that criminal defendants will "behave" while they await sentencing, it

---

**2.** This Court has confirmed this sentencing range and likely imposition of concurrent sentences for all the robberies, and the likelihood that Hollins would have been paroled at or near the end of 1993, through conversations with the Cuyahoga County Prosecutor.

is simply not credible to suggest that such conduct is the norm among criminal defendants. Moreover, Hollins's conduct was not undertaken solely in anticipation of an upcoming federal sentencing: from June of 1991, until September, 1992, Hollins did not know he would be indicted on federal charges. When his sentence was expunged in March, 1992, Hollins's behavior continued solidly on the course of rehabilitation. Indeed, in over fourteen years of this Court's experience, Brian Hollins is one of the most promising defendants, showing the most extensive rehabilitation, *ever* before this Court.

Taking each in isolation, Hollins's unusually laudable conduct, *or* the delay in the imposition of a federal indictment and sentencing, may not have placed Hollins's situation out of the contemplated realm of the Sentencing Commission. However, this Court finds that the combination of Hollins's substantially atypical rehabilitative conduct, *and* the unusual delay posed by the dual state and federal prosecutions, takes this case out of the "heartland" contemplated by the Sentencing Commission. Not only is Hollins a defendant who has engaged in atypical and impressive rehabilitation, but that very rehabilitation and progress would be effectively destroyed by the delayed imposition of a federal sentence consistent with the applicable guideline.

This Court finds that such a result would be irrational and unfair. Irrationality and unfairness, of course, are not grounds for this Court to depart from the sentencing guidelines. However, this Court is authorized by the guidelines themselves to grant a downward departure if it finds mitigating circumstances of such a kind, or to such a degree, that they were not taken into account by the Sentencing Commission. This Court finds that the circumstances of this case, and the specific facts proved by Hollins at the evidentiary hearing, in conjunction, squarely meet this standard. This Court therefore grants Hollins's motion for a downward departure.

### IV.

#### A. Sentencing Level

Without a downward departure, Hollins's offense level is 23 points, and his criminal history category is category I. Other than the aberrational bank robberies, Hollins has no prior juvenile or adult criminal record.

This Court's primary concerns in sentencing Hollins are providing him with needed psychological counselling, as recommended by Dr. Pincus; facilitating Hollins's continued educational and vocational progress; and protecting Hollins's ongoing efforts at drug rehabilitation. In imposing the following sentence, this Court is mindful of Congress's authorization to take into account the need for medical treatment and the most effective manner for providing educational and vocational training. *See* 18 U.S.C. § 3553(a)(2). This Court is also particularly mindful of Dr. Pincus's conclusion that Hollins is an unlikely candidate for recidivism so long as his psychological problems are given continued attention.

Hollins's conduct unquestionably warrants incarceration in some form. However, this Court finds that a sentence of 46 to 57 months in federal prison, at this point in time, would destroy the unusual and admirable rehabilitative progress which Hollins has made since the imposition of his state court sentence for these crimes, and would jeopardize Hollins's chances for long-term recovery. This Court also finds that such a sentence is far greater than that necessary to protect the public from crimes by Brian Hollins, and is in excess of that necessary to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). This Court finds that incarceration in a community sanctions center, which will permit Hollins to continue his educational progress and simultaneously receive needed counselling, while still substantially restricting his movement and privileges, is the only incarceration option appropriate in the circumstances.

Because a community sanctions center will only house an inmate such as Hollins for twelve months, this Court finds it necessary and warranted to depart to the highest level that will allow a period of incarceration lasting only twelve months, namely, level 12. Accordingly, based upon Hollins's extraordi-

nary rehabilitative conduct—and the probability that that very progress will be destroyed in prison—combined with the unique prejudice visited upon Hollins as a result of the successive prosecutions, this Court departs to an offense level of 12, criminal history category I, with a sentencing range of 10 to 16 months.

### B. Sentence

This Court sentences Hollins to twelve months of incarceration at Alvis Cope House, a community sanctions center located in Dayton, Ohio. Hollins shall receive privileges to leave the sanctions center only for classes at Wilberforce University, and for medical and psychological care. He will submit to continued random drug testing, and to outpatient mental health counselling. Inmates at Alvis Cope House are generally required to contribute 25% of their income to subsidize the cost of their incarceration. This Court waives that subsidy requirement as long as Hollins continues as a *full-time* student at Wilberforce. Should Hollins change to a *part-time* status, the subsidy requirement shall once again be imposed.

The period of incarceration at Alvis Cope House will be followed by a period of supervised release of two years, under the standard conditions of supervised release, and with special conditions of random drug testing and continued mental health counselling.

Alvis Cope House has indicated to this Court that it cannot accept Brian Hollins until September 15, 1994. Accordingly, this Court hereby immediately modifies Hollins's travel restrictions to permit him to travel to Wilberforce, Ohio, to attend classes at Wilberforce University which commenced on August 15, 1994. Hollins shall self-report to Alvis Cope House when notified to do so by the United States Marshal.

IT IS SO ORDERED.