**UNITED STATES of America,**

v.

**Anthony PERELLA, Defendant.**

**No. CRIM. 02–10141–NG.**

United States District Court,
D. Massachusetts.

July 30, 2003.

John A. Capin, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

David Sokol, Sokol & Kingston, Boston, MA, for Anthony J. Perella, Defendant.

## *AMENDED SENTENCING MEMORANDUM*

GERTNER, District Judge.

This Amended Sentencing Memorandum replaces the original Memorandum issued on July 25, 2003. Only minor typographical errors have been corrected.

The defendant, Anthony J. Perella ("Perella"), a twenty-two year old man, pled guilty to a felony information charging him with one count of Bank Robbery in violation of 18 U.S.C. § 2113(a). Since Perella's criminal record fits into the lowest criminal history category of the United States Sentencing Guidelines, Category I, the Guideline Range, absent a departure, would be thirty to thirty-seven months.

The defendant moved for a downward departure on account of his "extraordinary

rehabilitation." The crime to which he pleaded guilty resulted from his severe addiction to drugs—and uniquely addictive drugs at that—namely heroin and Oxy-Contin. Since the date of the offense, the defendant has totally changed his life and his behavior after residential and outpatient drug treatment and addiction programs, in which he continues to participate to this day. His claims are supported by the statements of the clinicians who have worked with him, and a pre-trial services officer with over twenty years experience.

Acutely aware of how narrow this category of departure is, I nevertheless concluded that Perella has met the standard. I sentenced him to a term of probation, with elaborate conditions, to insure—to the extent that is possible—that there would be no relapse into drug use.[1]

## I. ANALYTICAL FRAMEWORK: THE GENESIS OF "EXTRAORDINARY REHABILITATION"

The Sentencing Reform Act, 28 U.S.C. § 994(d), directed the United States Sentencing Commission (hereinafter the "Commission") to "consider" whether "physical condition, including drug dependence," has "any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that

they do have relevance." The Commission was to "subject those factors to intelligent and dispassionate professional analysis; and on this basis to recommend, with supporting reasons, the fairest and most effective guidelines it can devise."[2]

The Commission's response was less than clear. Drug dependence is mentioned in a policy statement, U.S.S.G. § 5H1.4, as part of the broader category of "physical condition" factors: "Drug or alcohol dependence or abuse" may not be the basis for a departure, even though the Commission recognized that "[s]ubstance abuse is highly correlated to an increased propensity to commit crime."

Although "not ordinarily relevant," the Commission recognized, as it must, that there were exceptions to the general rule. Factors like drug abuse "may be relevant . . . if such characteristic or circumstance is present to an unusual degree and distinguishes the case from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing." *Id.* § 5K2.0, cmt. The language is significant: The Court is to compare the offender's case with the typical cases covered by the Guidelines,[3] and to do so "in a way that is important to the statutory purposes of sentencing." Significantly, rehabilitation is among those statutory purposes of sentencing.[4]

---

1. A procedural note: Perella was sentenced on May 7, 2003, after hearings in September 2002 and January 2003. While I recited some of my findings in open court, I indicated to counsel that I would issue a formal sentencing memorandum, as is my practice, that would supersede my oral presentation.

2. Senate Judiciary Committee Report, S.Rep. No. 98–225, at 175 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3358. The Senate Judiciary Committee instructed judges to examine the characteristics of each specific offender thoughtfully and comprehensively. *Id.* at 52, 1984 U.S.C.C.A.N. at 3235 ("The purpose of the sentencing guidelines is to provide a

structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences.").

3. *See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 *Hofstra L.Rev.* 1, 45 (1988) (describing "heartland").

4. Congress ordered the Commission to establish policies and practices that met the traditional purposes of sentencing (retribution, deterrence, incapacitation, and rehabilitation) and to "reflect, to the extent practicable, advancement in knowledge of human behavior

Drug *rehabilitation*—as opposed to drug *dependence*—is specifically mentioned in § 3E1.1 of the Guidelines ("Acceptance of Responsibility"). Post-offense rehabilitative efforts (*e.g.,* counseling or drug treatment) are listed in the application notes as one indicium of acceptance of responsibility. U.S.S.G. § 3E1.1, app. note 1(g).

This distinction—between drug rehabilitation and drug addiction—plainly makes sense. The status of being addicted has an ambiguous relationship to the defendant's culpability. It could be a mitigating factor, explaining the motivation for the crime. It could be an aggravating factor, supporting a finding of likely recidivism. Barbara S. Meierhoefer, *The Role of Offense and Offender Characteristics in Federal Sentencing,* 66 S. Cal. L.Rev. 367, 385 (1992). On the other hand, the relationship between drug rehabilitation and crime is clear. If drug addiction creates a propensity to crime, drug rehabilitation goes a long way to preventing recidivism. In fact, statistics suggest that the rate of recidivism is less for drug offenders who receive treatment while in prison or jail, and still less for those treated outside of a prison setting.[5]

Thus, in *United States v. Sklar,* 920 F.2d 107 (1990), the First Circuit acknowledged that "extraordinary rehabilitation" could be a ground for departure from the Guidelines. *Id.* at 115–16. Title 18 U.S.C. § 3553(b) outlines the framework: It permits departures for qualitative reasons—whether a factor in the case at bar was considered by the Commission at all—as well as quantitative reasons—whether a given factor was found to an unusual degree. In appropriate circumstances, extraordinary rehabilitation, although mentioned as a factor in "acceptance of responsibility," could fit the qualitative standard for departure.

The glaring question is, what cases meet that test? The obvious concern is that courts will fashion a standard so broad as to permit the exception to swallow the rule. The only way to address those concerns is first to identify the standard with care. Then, in implementing the standard, the court should give weight to the expertise of clinicians both within and without the court system: drug counselors and pretrial and probation officers. The treatment of drug addiction is an area of professional specialization. The enterprise of evaluating a particular offender's rehabilitation necessarily entails expert judgment. Finally, the trial court, like the appellate court, must exercise its own expertise, stepping back from the particular defendant and comparing him or her to other offenders, to certify that the standards it applies do not carve out too wide a category of offenders, thereby labeling "extraordinary" what is really not.

I do not promise that at the end of the analysis everyone will agree that what I regard as extraordinary is truly so. But just because the enterprise is difficult—and it is—does not mean that we should not try. A human being's life and liberty are at stake.

At times, the First Circuit has sought to provide an affirmative definition of extraordinary rehabilitation—what extraordi-

---

as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). And the Court was directed to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]," including the need "to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). In my judgment, the sentence I have imposed on Perella meets that test.

**5.** Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders,* 53 Hastings L.J. 1217, 1220 (2002).

nary rehabilitation *is*—although, candidly, most of the cases, here and elsewhere, seem to focus only on what it is *not*.

Following 18 U.S.C. § 3553(b) carefully, *Sklar* directs the court to compare the rehabilitative efforts of the defendant with the "scope of presentence rehabilitation" contemplated by the Guideline on acceptance of responsibility. *Id.* at 116. Thus, the court noted, "in an appropriate case, a defendant's presentence rehabilitative efforts and progress can be *so significant*, and can *so far exceed ordinary expectations*, that they dwarf the scope of presentence rehabilitation contemplated by the sentencing commissioners when formulating section 3E1.1." *Id.* (emphasis added). The problem is that there is no way of knowing what degree of acceptance of responsibility the Commission had in mind when it formulated § 3E1.1.[6]

To make matters still more complicated, other language suggests that courts are to compare any given defendant with all other defendants and ask whether the defendant's rehabilitation efforts are "present to an exceptional degree" or "make[ ] the case different from the ordinary case where that factor is present." *United States v. Craven*, 239 F.3d 91, 99 (1st Cir.2001) (quoting *Koon v. United States*, 518 U.S. 81, 96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)) (internal quotation marks omitted).

Even with this guidance, the enterprise is less than clear. In *United States v. Lacarubba*, 184 F.Supp.2d 89 (D.Mass. 2002), which involved an analogous issue, namely, when family circumstances are sufficiently "extraordinary" to permit a departure under § 5H1.6, I outlined the problem:

How does a court go about this task [of defining what is extraordinary]? The enterprise is in part empirical. How does this human being compare to others the trial court has seen? But it necessarily involves more than simply counting noses. How atypical does he or she *have* to be—one in a million, five in a million, five percent of all defendants, etc.? This kind of line-drawing involves the exercise of normative judgments: What kind of punishment do human beings facing these situations *deserve* given the purposes of the SRA? Where *ought* the line between typical and atypical be? No bright line rule was announced by the Commission; none can be announced by a court.

*Id.* at 93.

Other language in First Circuit opinions seems to eschew comparisons with other defendants. This test focuses only on the defendant and asks whether his behavior reflects a "fundamental change in attitude." *Id.* at 100.

Perhaps because of the difficulty of the task, the court has mainly defined extraordinary rehabilitation by noting what it *is not*. In effect, case after case announces: No, that's not it, nor that, nor that... It is not enough simply to go through a halfway house program and take other rehabilitative measures, as the *Sklar* defendant did. *Sklar*, 920 F.2d at 117. Nor is it enough, holds *United States v. Rushby*, 936 F.2d 41 (1st Cir.1991), to couple post-arrest abstinence and enrollment in a treatment program with holding down a job and pursuing gainful employment. *Id.* at 42–43.

To be sure, it may be inevitable that appellate courts approach Guideline interpretation this way—defining when the

---

6. The Commission did not publish the evidence on which it relied to fashion the Guidelines. It never made available to courts and advocates the data supporting the "typical"

cases from which to judge what is "atypical." There is no record of legislative history, as there would be with statutes, no committee reports, no public hearings, etc.

standard is not met. After all, the First Circuit sees only a small percentage of the cases that the district court reviews. The First Circuit reviews only those cases in which a district court has decided to depart, a fraction of the total number of cases, and then only those that the government chooses to appeal, a smaller number still. Moreover, the sampling of cases that the Court of Appeals receives are typically those that district courts have deemed "extraordinary." As a result, the First Circuit is not in a position to see the true "heartland" of cases that come through the courts. An individual case that stands out from the class of cases before a district court might seem humdrum when compared to the more limited and exclusive corpus of "extraordinary" cases that are actually appealed.

As I am a district court judge, I have to seek greater precision. If this departure is to have any meaning—and I have to assume it does—I have to identify when extraordinary rehabilitation is present. It is obviously not enough to say that wherever the district court places the line between ordinary and extraordinary rehabilitation efforts, it has to make certain that such departures are, as the First Circuit colorfully notes, "hen's teeth rare." *Craven*, 239 F.3d at 99. Nor is it enough to intone these words "extraordinary rehabil-

itation" over and over again, when what we really mean is: Never.

## II. WHAT "EXTRAORDINARY REHABILITATION" MEANS IN THE CASE OF DRUG ADDICTION

Before I turn to Perella's situation, I wish to outline in general what is typical and atypical in the treatment of drug addiction:

The United States government estimates that half of all federal prison inmates have used drugs and that "many are drug addicts." Office of Nat'l Drug Control Policy, *Understanding Drug Treatment* 27 (June 1990). Offenders with drug problems are typically referred to drug programs either as a condition of pretrial release, or after sentencing. (There are few if any programs available in Massachusetts to prisoners detained prior to trial.) As I noted above, statistics suggest that the rate of recidivism is lower for drug offenders who receive treatment while in prison or jail, and still lower for those treated outside of a prison setting.[7] If offenders did not attend the programs as required, their bail would be revoked. Thus, there is nothing "extraordinary" about attending a drug program.

Fewer defendants, however, successfully complete these programs. Many do not. Nevertheless, successful completion is not

---

**7.** Rosenblum, *supra* note 6, at 1220.

The government goes into considerable detail about the offense, as if it somehow trumps this departure. Indeed, my analysis is precisely the opposite. Where it is as clear as here that addiction motivated the crime, departures based on "rehabilitation" make even more sense. For instance, in *United States v. Hollins*, 863 F.Supp. 563 (N.D.Ohio 1994), the defendant, a drug addict, committed seven bank robberies in Ohio. *Id.* at 564. He was prosecuted in state court for the last robbery and received a "diversionary disposition" requiring him to participate in a 30-day in patient drug rehabilitation program. *Id.*

He completed the program and his record was expunged. *Id.* Fifteen months after his state robbery conviction, he was indicted by a federal grand jury for seven counts of bank robbery and pleaded guilty to five. *Id.* At the time of the federal sentencing, Hollins had been drug-free for almost three and one half years. *Id.* at 565. His offense level was a 23; without a departure he would be vulnerable to 46 to 57 months of incarceration. *Id.* at 568–69. The district court found that the only appropriate confinement was a halfway house and departed downward eleven offense levels to allow him to enter one. *Id.* at 569–70.

enough for "extraordinary rehabilitation." I recognize that if that were all that was necessary to qualify for this departure, the exception would swallow the rule.

Should the exception then be limited to those who not only attended such programs and not only completed them, but rather those who are "cured" of their addiction? With addiction, however, there is no moment of "cure." Relapse is part of every addict's life in perpetuity.

Do I pick the person then with the fewest relapses? Or the defendant who has been off drugs for the longest time? Most addicts get into treatment programs because they have been forced by the courts to do so. Their recovery is necessarily circumscribed by the length of time it takes to get from arrest, referred to drug programs, and to sentence. It seems unfair to determine this departure based on the happenstance of the court's calendar.

Do I favor the person who spontaneously rehabilitated, without the constable at the door? Clearly a court can have the additional confidence that such a person will be drug-free even after the court sanctions are no longer available. But spontaneous rehabilitation is not the only measure of success in remaining drug-free. Experts identify other indicia—such as the extent of the defendant's preexisting addiction, the degree of effort required to achieve rehabilitation, the degree to which the defendant did more than was required of him, the quality of the defendants' interactions with drug professionals and peers, whether he or she relapses in the face of

stressors, the support of strong family life, the clinician's level of certainty that the rehabilitation is real and permanent, the degree of rehabilitation achieved, and a host of other factors.

Finally, the First Circuit has also considered what I will describe as "rehabilitation plus." [8] I use this term to refer not only to defendants who have rehabilitated themselves but also to those who have helped other addicts, or other offenders in the community. *See, e.g., United States v. Bradstreet,* 207 F.3d 76, 78–79, 83–84 (1st Cir.2000) (affirming a downward departure for extraordinary post-sentence rehabilitation based on defendant's tutoring of other prisoners, teaching adult education classes in prison, serving as prison chaplain's assistant and clerk of prison parenting program, and lecturing in the community on ethical perils in the business world); *United States v. DeShon,* 183 F.3d 888, 890 (8th Cir.1999) (affirming a downward departure for extraordinary presentence rehabilitation on the basis of defendant's genuine acknowledgment of responsibility for his crimes, radical alteration of his lifestyle to include attending church four times a week, continuous commitment to counseling, and undertaking of seventy-plus-hour work weeks to catch up on bills). As I mentioned above, the enterprise is inexact, but for the sake of Mr. Perella's, and others similarly situated, it is worthwhile.

### III. *PERELLA'S SITUATION*

Perella grew up in a solid middle-class home in Roslindale, Massachusetts, with

---

**8.** At various times, I have asked Assistant United States Attorneys to define the contours of what I have described above as the "rehabilitation plus" standard. What I have heard from them sounds more and more like what I would describe as the "Mother Theresa" approach. To qualify for this departure, the defendant not only has to be rehabilitated from drugs, he has to be selfless, helping not only himself but others, peers, students. While I think that standard is quite excessive, as I describe below, for a twenty-two year old man who lives at home, the mere act of getting up in front of a rowdy group of school children, announcing out loud that he is an addict and that he has messed up his life, is the functional equivalent.

his parents and older sister. Now twenty-two, he has lived at home all of his life, except for the period during which he was in residential drug treatment. His family has remained enormously supportive of him through his addiction. They have attended all court proceedings. They have been closely involved in the details of his treatment.

Perella attended Catholic Memorial High School in West Roxbury. At first he was successful, a talented hockey player and decent student. As time passed, he became more and more consumed by drugs and alcohol, marijuana at first, and drinking, then psychotropic mushrooms. His school record began to deteriorate—with multiple absences, frequent late arrivals. The principal rated the defendant's leadership, reliability, scholastic standing and attendance as poor. He was ultimately academically discharged from high school.

His relationship with his family suffered. As he put it, he fell in with the "wrong crowd." By age nineteen, he was extremely addicted to opiates—OxyContin and heroin.

Significantly—or extraordinarily—although Perella reported an extensive history of substance abuse, he had virtually no record. Typically, a drug addict distributes drugs to serve his own addiction and in short order amasses a record of drug offenses; that was not the case with Perella. Typically, someone addicted to opiates moves on to other crimes—theft, breaking and entering—in order to serve his addiction; again, that was not true of Perella except for a single six week period during which he committed the instant offense.

Between June 2, 2001, and July 2001, Perella was a getaway driver for Michael Tannous [9] in three bank robberies and two attempted bank robberies, including the robbery charged in the instant information (the July 20, 2001, robbery of the Cambridgeport Bank). Perella admitted that he and Tannous had a non-functional handgun during the robberies, stored either at Perella's home or at the home of another friend; the gun was never found. Perella received a share of the proceeds from Tannous after each robbery. For the July 20, 2001, robbery, Perella stole the license plate used on the getaway car.

**9.** As I indicated on the record, I am troubled by the difference in outcome between the Perella sentencing and the sentencing of Michael Tannous. Tannous appeared before Judge Woodlock on the same charges. While Perella claims that Tannous was the mastermind of the crimes and he was "only" the getaway driver, Tannous states the opposite. While the issue was not litigated before me at all, I did review Tannous' presentence report. Tannous had a criminal history score of II, with a record of breaking and entering, malicious destruction of property, and drug offenses, including the distribution of steroids. As noted above, Perella has essentially no record. At eighteen, he was charged with operating a motor vehicle without a license, failure to stop for police, carrying mace, and other traffic offenses. All charges were continued without a finding and dismissed. Tannous reported considerable drug use, perhaps use that was on a par with that of Perella. From the record, however, it appears that Tannous' counsel did not make a record of the extent of drug addiction or his amenability to treatment. Moreover, because of Tannous' record, he was detained pending trial, so he did not have the opportunities for rehabilitation that Perella had. Whatever the reason for the different sentence in these case—whether attributable to the judge, counsel, or the defendant's record—is irrelevant under the Guidelines regime. *See United States v. Nelson–Rodriguez*, 319 F.3d 12, 59 (1st Cir. 2003) (holding that a court may not depart from the Guidelines solely "to correct a disparity between the sentences of coconspirators") (citing *United States v. Ortiz–Santiago*, 211 F.3d 146, 150 (1st Cir.2000)).

It was the prototypical crime spree, triggered by Perella's addiction. There was nothing like it in Perella's life before; nothing like it afterward.

After the offense, Perella was less than candid in his interview the Federal Bureau of Investigation. On January 3, 2002, he was reinterviewed and he disclosed the details described above, including his participation in offenses beyond what the government charged. It should be noted that this interview took place without counsel present.

Between the date of the offense in July 2001 and April 2002, when Perella was arrested, he lived at home and worked. He had no further problems with law enforcement, although it was clear that the defendant continued to use heroin.

On April 9, 2002, the defendant was ordered to refrain from using or possessing illegal drugs as a condition of pretrial release. On May 28, 2002, the defendant tested positive for cocaine. On June 19, 2002, he pled guilty to the instant offense, at which time the Court modified the conditions of his release to include substantial drug treatment because of evidence of continued drug use.

On June 25, 2002, Pretrial Service referred defendant for an intake assessment and a possible referral to ADCARE, an outpatient drug rehabilitation facility. Perella was less than enthusiastic or even cooperative. As Judy Oxford, a pretrial services officer with over twenty years of experience with drug offenders, wrote:

> [Perella] is agreeable to counseling (as the alternative would be a bail violation and perhaps revocation). Mr. Perella does not see his drug use as an addiction. He has little information about drug addiction and how it has impacted his life (except for the recent arrest).

On July 1, 2002, Janet V. Lawrence, a licensed social worker at ADCARE in Boston evaluated the defendant and recommended that he participate in outpatient substance abuse treatment. Shortly thereafter, Perella again tested positive for morphine use.

On July 15, 2002, Perella was referred to Spectrum House, an inpatient drug treatment facility, and entered a detoxification program. Senior case manager Christopher W.G. Graham of Spectrum House advised that the defendant's treatment plan addressed his "reported anxiety" and "acceptance of his disease," prevention of relapse, understanding of the Twelve Step Program and recovery environment.

Nevertheless, Perella was still struggling, as many drug addicts do. On July 31, 2002, he received a written termination warning for his failure to follow the directions of Spectrum House staff.

Some time after July 2002, all of the professionals who interacted with Perella reported a "fundamental" change in his attitude. He fully acknowledged his addiction and his relapses. He participated in all of the activities of Spectrum House. He made plans to continue his recovery even after his discharge, including attending Twelve Step Program meetings numbers of times per week. He took full responsibility for his misconduct the previous summer. While many participate in such programs, many do not complete them successfully, much less with the enthusiasm and attitude that Perella demonstrated.

Significantly, for the "rehabilitation plus" criteria described above, Perella began to help others—other residents in Spectrum House battling their own addictions. His clinician reported: "He ... demonstrated positive behavior changes that should prove helpful in preventing future relapse into substance abuse and illegal activity, ... he demonstrated 'leadership qualities and responsibility as a peer coordinator.'" For the young man

whose principal at Catholic High School reported just the opposite qualities, this was quite a change. Even Perella's "recovery partners" wrote to the Court to describe the significance of Perella's help, and the power of his words and his example.

On January 15, 2003, Perella was discharged from Spectrum House and brought to Court for sentencing. While probation had assembled a considerable amount of material suggesting a successful rehabilitation, as had Pretrial Services, the government took the position that success in a structured environment did not meet the test of "extraordinary rehabilitation." I agreed.

I fashioned a test of Perella's rehabilitation, to the extent that was possible on pre-trial release. I continued the case for six months to see if the favorable signs identified by clinicians working with Perella would continue upon his discharge from Spectrum House. The goal was to see how Perella handled his freedom, in order to predict whether he would remain drug free in future.[10]

To be sure, the test was imperfect. It could not really replicate what Perella's life would be like after his criminal sentence had expired. He was released on a host of pretrial conditions—that he attend the Intensive Out–Patient program at AD-CARE, Inc, attend AA and NA (Alcoholics Anonymous and Narcotics Anonymous) five times per week, speak with high school students, and submit to repeated drug testing.

Nevertheless, by every single indicator—again, the evaluation of every professional with whom he has interacted—Perella's progress has been exceptional.[11] Mr. William Sullivan, the group leader and counselor for the Intensive Out Patient program, reports that Perella is an active member of the group and committed to his recovery. He has done what the Court has ordered him to do and more. He not only attends the meetings required by Pretrial Services, Perella attends meetings every weekday night—NA/AA, therapy sessions, etc.—after a long day's work, sometimes traveling over an hour to do so. He has thrown himself into his own recovery with a commitment that is unusual. In addition, he regularly attends community meetings, and meets with his sponsor without fail.

Beyond that what has been asked of him, Perella has worked with children at risk in the community. While at Spectrum House, Perella expressed an interest in speaking to teenagers about his experiences. Ms. Oxford arranged for him to speak on two occasions at the Children's Friend Program in Worcester, a program for youth at risk for criminal activity and substance abuse, run by Christopher Graham, his former clinician. One talk was arranged at the last minute, Perella having to rush back from work, literally covered in dust.

Ms. Oxford recounted Perella's profound anxiety at standing up in front of an audience in general, much less sharing details of his addiction. Nevertheless, he did so,

10. *See e.g., United States v. Flowers,* 983 F.Supp. 159, 172–73 (E.D.N.Y.1997) (continuing a case to allow the defendant to continue or to begin rehabilitation efforts that would not be available if the defendant were incarcerated).

11. At the hearings, Ms. Oxford was asked to "rank" this defendant's progress next to that of other offenders. To her credit, she made it clear that nothing in the lexicon of drug counselors compares to the legal vocabulary of the Guidelines' "extraordinary rehabilitation." She would testify to the underlying facts—a fundamental change in Perella's attitude, going above and beyond what was asked of him, the significance of his efforts with schoolchildren at risk, etc.

recounting his experiences with substance abuse, and the disturbance it caused in his life. According to Mr. Graham, Perella's words had quite a positive effect on his young audience.

Notwithstanding his demanding recovery schedule, Perella remained employed by Local 22, Laborer's International Union in Malden Massachusetts. On his own initiative, Perella received a GED, or general high school equivalency diploma. Ms. Oxford reports that there was a snow storm on the day his equivalency test was scheduled. Perella went to the site of the test even though the weather had closed down traffic in the area. Only upon his arrival did he learn that the test had been cancelled. Undaunted, he rescheduled and passed the test at a later date. Ms. Oxford identified this perseverance as "goal setting" behavior she had never before seen in him, the kind of future-oriented approach that forecasts a successful rehabilitation. She also reports that he was saving money to take college courses in the future.

Ms. Oxford prepared a written report and gave oral testimony during Perella's sentencing. After her initial presentation, she was examined by the AUSA. Her testimony buttressed my conclusion that Perella's record involved the kind of concrete change in attitude, a fundamental shift in behavior, that is extraordinary.

Without a departure, Perella would serve at least thirty months in prison. I specifically questioned Ms. Oxford as to what she predicted would be the impact of such sentence on Perella. Given "his age, his fragile ego and early sobriety," she noted, "putting him in a situation in which it would be a structured environment but not a healthy living environment, it would be difficult to continue progressing as he has right now." [12] As the Court noted in *United States v. Rodriguez*, 724 F.Supp. 1118 (S.D.N.Y.1989), that due to his "impressive rehabilitation" the defendant no longer posed a danger to society and that the Guideline-prescribed sentence "would serve no end but ritualistic punishment with a high potential for destruction." *Id.* at 1119.[13]

Finally, in order to test my conclusion that Perella is entitled to a downward departure for his extraordinary rehabilitation, I have reviewed other cases in which this issue was raised before me, to make certain that I was not inadvertently expanding this category beyond what the First Circuit envisioned. Of the countless numbers of individuals I have sentenced over the past year, I have departed on this ground in only a single case. In every other case where the issue has been raised, I have declined to depart.

For all of the above reasons, I departed to a level 10. I sentenced Perella to a term of probation for five years, six months of which he would serve in home detention with electronic monitoring. In addition, Perella was ordered to pay resti-

---

**12.** In *United States v. Maier*, 975 F.2d 944 (2d Cir.1992), for example, the Court of Appeals affirmed the trial court's downward departure to allow the defendant to continue methadone treatment, which would have been impossible in prison. *Id.* at 945, 948–949. Similarly, the court in *United States v. Williams*, 65 F.3d 301 (2d Cir.1995), departed to facilitate the defendant's entry into a drug treatment program. *Id.* at 306. The court in *United States v. Shasky*, 939 F.Supp. 695 (D.Neb.1996), determined that it would be imprudent to inter-

rupt the defendant's sex-addiction therapy which was not available to him in prison. *Id.* at 697.

**13.** Rodriguez was a thirty-five year old addict who was separated from his wife and children at the time of his offense, was convicted of violating narcotics laws by selling two vials of crack cocaine for ten dollars. *Rodriguez*, 724 F.Supp. at 1119. After his arrest he obtained employment, reunited with his wife, and remained drug free for two years. *Id.*

tution in the amount of $750.00 and to participate in a program for substance abuse, presumably continuing in the programs in which he was currently enrolled.

While many of the causes of crime remain a mystery to us, we *know* that drug addiction leads to a "propensity to commit future crime," as the Commission acknowledged in § 5H1.4 of the Guidelines. If, as is clear in this case, drug addiction motivated the crime, it should follow that this rehabilitated defendant is not likely to be a recidivist. Perella's sentence is entirely consistent with the Guidelines; and what is more, it makes sense.

**SO ORDERED.**